**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

| | | |
|---|---|---|
| ENTERTAINMENT USA, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. 1:12–CV–116 |
| | ) | |
| MOOREHEAD COMMUNICATIONS, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

This matter is before the Court on the: (1) Motion for Summary Judgment filed by Plaintiff Entertainment USA, Inc., on August 18, 2014 (DE# 86); (2) Motion for Partial Summary Judgment filed by Defendant Moorehead Communications, Inc., on August 18, 2014 (DE# 90); (3) Motion to File Exhibits in Opposition to Summary Judgment Under Seal filed by Defendant on September 15, 2014 (DE# 97); and (4) Motion to Strike filed by Defendant on September 29, 2014 (DE# 99). For the reasons set forth below, Plaintiff's Motion for Summary Judgment (DE# 86) is **DENIED**, Defendant's Motion for Partial Summary Judgment (DE# 90) is **GRANTED IN PART AND DENIED IN PART**, Defendant's Motion to File Exhibits in Opposition to Summary Judgment Under Seal (DE# 97) is **GRANTED**, and Defendant's Motion to Strike (DE# 99) is **DENIED AS MOOT**.

<u>FACTS</u>

For the purposes of the parties' motions for summary judgment, the facts below are material and undisputed:

Plaintiff Entertainment USA, Inc. is one of several companies doing business as One Wireless World ("OWW"). OWW was a multi-carrier for wireless services including AT&T, Nextel, Sprint, and T-Mobile, until the spring of 2006, when OWW began working exclusively with Sprint. OWW served the central Pennsylvania area, and had a significant presence in that area at that time. Chau Nguyen ("Chau") was CEO of each of the companies doing business as OWW. Chau and his brother, Chinh Nguyen ("Chinh"), co-owned these companies until Chinh sold his interest to Chau in January 2007.

Defendant Moorehead Communications, Inc., ("Moorehead") is a master agent for Verizon Wireless ("Verizon"), which signs up individuals and entities to sell Verizon cellular phone services as a sub-agent or sub-dealer of Moorehead. Originally located in Indiana, Moorehead has expanded to numerous states throughout the country. Moorehead began expanding into the central Pennsylvania area in the early 2000s. By 2005, Moorehead had signed up two sub-dealers by the names of "Kimmel's 1-Stop" and "Quick Cell Phone."

In an effort to expand Moorehead's presence in central Pennsylvania, Moorehead entered into an agreement with OWW for

referral fees ("Referral Agreement") in January 2006.  The two-page Referral Agreement states in large part:

### OWW Referral Fee

The proposed referral fee is designed to compensate OWW for location handoffs and offset loss incurred from adding another carrier to their Branded Store's existing lineup.  This will also include any locations, other than the current list of Branded stores that are approved through Verizon and signed up under Moorehead Communications in the future that are referred directly to us by the OWW group. [1]

Moorehead is proposing the following:

> For all handoffs/referrals from OWW, dating back to Jan. 1, 2006 and any locations that are approved following that date as a direct result of an OWW referral, we will pay a referral bonus in the amount described below.

### Monthly Activations for the referred group

*** 20$ per activation (New Activations Only) to assist with ramp up period which will remain in effect 6 months from the date this agreement is signed by both parties.  After which, referral bonus will be adjusted to the appropriate tier.  (See Below)

50-150 per month – 10$ referral bonus per activation[2]
151-250 per month – 15$ referral bonus per activation
251-350 per month – 20$ referral bonus per activation
351-450 per month – 25$ referral bonus per activation
451-500 per month – 30$ referral bonus per activation

---

[1] The parties do not dispute that the term "Branded" stores refers to OWW dealer locations that are contractually bound to sell only products or services approved by OWW, and are identified as OWW locations by signage and store name.  (*See* DE## 92-4 at 13-14, 92-5 at 5.)  These store locations may also be subject to a lease in favor of OWW. (*See* DE## 92-4 at 13, 92-5 at 4.)

[2] The Referral Agreement contains a single handwritten revision, changing the lowest tier of activations from "100-150 per month" to "50-150 per month." (DE# 95-1 at 2.)  The parties do not dispute this revision.

501 per month and higher – 35$ referral bonus per activation

*There will be a flat fee of 10$ per 2 year upgrade in addition to the items listed above.

*There is a 180 day chargeback period in which commissions can be revoked. If we chargeback any of the referred locations for a deactivation by one of their customers, OWW will also be charged back the referral bonus for that activation.

Any representation required for Verizon in these locations, will be conducted entirely by Moorehead Communications and will not be affiliated with the OWW group in any way. These locations will be approved on a case by case basis by Verizon and will be designated a sub agent of Moorehead Communications Inc.

All support, training, merchandising, collateral and commission payout to these approved locations, will be supplied by Moorehead Communications, and will not be filtered through OWW in any way.

List of Referred locations as of Jan. 9th, 2006 (Pending Approval)

> [Table of ten rows, each row identifying a store name, an individual's name, and a street address, among other information. For example, "John Forsyth-Etown Branded . . . John Forsyth . . . 32 N Market Street." The table also includes street addresses for "Quick Cellular" and "Kimmel's 1 Stop."]

Street Kicks – Tony Baaklini – Harrisburg, PA

Signage Change –

Moorehead will help with Signage build-out in select locations, and will help to finance 50% of the build-out. This will however, be approved on a case by case basis and will require a minimum of activations per month, per location. This is will be coordinated with the independent owner/operator and will not be filtered in any way through OWW corporate.

(DE# 95-1 at 2-3.)  Larry Myers ("Myers"), Moorehead's Vice President of the Dealer Division at the time, drafted the Referral Agreement.  Chau negotiated the Referral Agreement on behalf of OWW.

In December 2006, Moorehead employee Erik Schlesselman ("Schlesselman") communicated with OWW employee Jason Annibali via email regarding a list of specific OWW locations referred to Moorehead by OWW ("Annibali Email").  (DE# 88-2 at 26-42.)  At some point, OWW also provided Schlesselman with a list of dealer locations that OWW was terminating because those dealers did not want to sell exclusively for Sprint and OWW ("Term List").  (DE# 89-3 at 20-22, DE# 87 at 48-49.)  Chau testified that he referred individuals to Moorehead during several meetings with Schlesselman by displaying lists of individuals' names on projection screens and computer monitors. (DE# 89-3 at 30.)  He also testified that he shared OWW's dealers and their credit terms with Schlesselman.  (*Id.*)  Chinh testified that OWW gave Moorehead access to its vice-presidents, the names of all of its people, and its business model.  (DE# 89-4 at 20.)

In 2007, Chau purchased Chinh's interests in the OWW companies, and formed a new company named "OWW Consulting, Inc." In mid-2007, OWW Consulting hired one of Chinh's companies, "ChinhCo Incorporated," to perform consulting services. According to the Consulting Services Agreement, ChinhCo's

services were (1) personnel management, (2) management of certain sub-agent relationships, and (3) leasing. (DE# 95-7 at 11.) OWW claims that it paid ChinhCo for consulting services in 2007, but provides no proof of payment.

By January 2008, OWW's relationship with Sprint had terminated. Chau created a new entity, "United Consulting," and Chinh operated his own company named "Wireless Advisors, Inc." Neither United Consulting nor Wireless Advisors is an OWW company.

In January 2008, the OWW Consulting's Vice President of Operations emailed a location to Moorehead, and Chinh provided Moorehead with a spreadsheet of OWW locations. In February 2008, Chau proposed a new referral agreement with Moorehead and United Consulting, which included, among other things, referring "quality exclusive agents" to Moorehead. No agreement was reached.

OWW asserts that it referred locations, individuals, and entities to Moorehead in the Referral Agreement, the Annibali email, the Term List, and/or in verbal communications with Moorehead. Some of these individuals include:

1. John Forsyth ("Forsyth"). Forsyth was subagent for OWW, and his "Etown" location at 32 N. Market Street is identified in the Referral Agreement. (DE# 95-1 at 3.) Forsyth eventually closed his Etown store and moved to a

larger location at 1575 South Market.  Forsyth had more than ten locations that were approved by Verizon and signed up under Moorehead.

2. Mike Kapp ("Kapp").  Kapp joined OWW in 2006 or early 2007, after working for T-Mobile for several years.  Kapp managed OWW-owned stores in western central Pennsylvania for approximately one year.  Kapp left OWW and pursued a venture called Mobile Pros with Chinh, which involved selling for T-Mobile.  Chinh suggested that Kapp join Moorehead during a meeting with Moorehead employees. (DE# 89-7 at 9.)  Kapp left Mobile Pros in July 2007 to begin working with Moorehead as an account manager.  Kapp was promoted twice, and is now Vice President of Moorehead's Northeast and South regions of its Dealer Division.  Multiple regional managers report to Kapp in this role.

3. Mike Trimble ("Trimble").  Chau testified that, during a couple of meetings in 2006 and 2007, he told Schlesselman that Moorehead might want to hire Trimble, who was working for OWW at the time.  (DE# 89-3 at 24-26.) Trimble worked for OWW until January 2008.  He then worked for Mobile Pros for over a year before joining Moorehead.  In 2010, Moorehead began establishing locations in H.H. Gregg stores.  Trimble became Vice

President of Moorehead's H.H. Gregg Division, and, as of 2013, oversaw more than 220 locations in the H.H. Gregg Division in almost 20 states.

4. Jordan Golob ("Golob"). Golob had four locations that were approved by Verizon and were signed up under Moorehead. Because both Forsyth and Chinh claimed to have referred Golob to Moorehead, Moorehead entered into an agreement with Forsyth and Chinh in 2008 to split a referral fee for a one-year period.

Between 2006 and mid-2008, Moorehead paid OWW referral fees totaling approximately $25,000, and provided monthly accountings of the referral fees due to OWW under the Referral Agreement. Moorehead paid OWW referral fees for activations of two-year service plans at one Golob location in December 2007 and January 2008. Moorehead never paid OWW for any activations of one-year cellular service plans, data services, or DISH Network services. During that time, OWW never complained to Moorehead regarding the referral payments or accountings. OWW maintained no formal process to monitor or review the referral fee payments or monthly accountings. Chau testified that OWW representatives periodically asked agents how they were "doing with Verizon" in order to verify that Moorehead's "numbers . . . made sense." (DE# 96-5 at 3.) Moorehead ceased making referral payments to OWW in mid-2008 because Moorehead's Chief Strategy Officer

believed that the Referral Agreement had expired and that the locations qualifying for referral fees no longer existed.

On April 9, 2012, OWW filed a complaint in federal court alleging that the Referral Agreement entitles OWW to a fee for every activation and upgrade resulting from every referral it made to Moorehead, regardless of whether the referral was a location, entity, or individual. The complaint includes three counts against Moorehead: breach of contract, accounting/injunctive relief, and unjust enrichment. (Comp., DE# 1.) OWW seeks more than $23 million for past referral fees and an injunction requiring Moorehead to continue to pay referral fees in the future.[3]

On August 18, 2014, OWW filed a motion for summary judgment, which the parties have fully briefed. (DE# 86.) On August 18, 2014, Moorehead filed a motion for partial summary judgment, which the parties have fully briefed. (DE# 90.) On September 15, 2014, Moorehead filed a motion to file certain exhibits in opposition to summary judgment under seal. (DE# 97.) OWW filed no response to this motion. On September 29, 2014, Moorehead filed a motion to strike certain testimony from OWW's response to Moorehead's summary judgment motion. (DE# 99.) The parties have fully briefed the motion to strike.

---

[3] The $23 million damages sought by OWW includes approximately $12 million in referral fees for the locations in the Moorehead division managed by Kapp, and approximately $5 million in referral fees for Moorehead's H.H. Gregg locations under Trimble's management.

## SUMMARY JUDGMENT STANDARD

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. In determining whether a genuine dispute of material fact exists, the Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *See Ogden v. Atterholt,* 606 F.3d 355, 358 (7th Cir. 2010). A party opposing a properly supported summary judgment motion may not rely on allegations in his own pleading, but rather must "marshal and present the court with the evidence [he] contends will prove [his] case." *Goodman v. Nat'l Sec. Agency, Inc.,* 621 F.3d 651, 654 (7th Cir. 2010). "[I]nferences relying on mere speculation or conjecture will not suffice." *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009) (citation omitted). If the non-moving

party fails to establish the existence of an essential element on which he bears the burden of proof at trial, summary judgment is proper. *See Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006).

Where the parties file cross-motions for summary judgment, the Court must consider each motion, but despite the parties' agreement that no genuine issue of material fact exists, the Court can deny all motions if the parties do not establish their rights to judgment as a matter of law. *See Garbach v. Evans,* 196 F. Supp. 2d 746, 747 (N.D. Ind. 2002).


DISCUSSION

Motions for Summary Judgment

The parties move for summary judgment on multiple issues relating to OWW's breach of contract claim, as well as OWW's unjust enrichment claim. Moorehead also moves for summary judgment in OWW's accounting claim. Where "neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits." *Citadel Group Ltd. v. Washington Reg'l Med. Ctr.,* 692 F.3d 580, 587 n.1 (7th Cir. 2012) (quotation omitted). Here, the parties agree that Indiana law applies. (*See* DE## 91 at 5, 94 at 5.) Thus, the Court will apply Indiana law in deciding each of these issues.

<u>Count I:  Breach of Contract</u>

The parties' arguments regarding OWW's breach of contract claim raise issues of contract interpretation. "Summary judgment is especially appropriate in the context of contract interpretation because the construction of a written contract is a question of law." *TW Gen. Contracting Servs., Inc. v. First Farmers Bank & Trust,* 904 N.E.2d 1285, 1287–88 (Ind. Ct. App. 2009) (citation omitted).  The goal of contract interpretation is to determine the parties' intent at the time that they made the agreement. *Citimortgage, Inc. v. Barabas,* 975 N.E.2d 805, 813 (Ind. 2012) (citation omitted).  To do so, the Court begins with "the plain language of the contract, reading it in context and, whenever possible, construing it so as to render each word, phrase, and term meaningful, unambiguous, and harmonious with the whole." *Id*. (citation omitted).

> Where terms of a contract are clear and unambiguous, we will apply the plain and ordinary meaning of the terms and enforce the contract according to its terms. If necessary, the text of a disputed provision may be understood by referring to other provisions within the four corners of the document.  The four corners rule states that where the language of a contract is unambiguous, the parties' intent is to be determined by reviewing the language contained within the "four corners" of the contract, and parol or extrinsic evidence is inadmissible to expand, vary, or explain the instrument unless there has been a showing of fraud, mistake, ambiguity, illegality, duress or undue influence.  Extrinsic evidence cannot be used to create an ambiguity.

*John M. Abbott, LLC v. Lake City Bank*, 14 N.E.3d 53, 56 (Ind. Ct. App. 2014) (citations and quotations omitted). A document is not ambiguous merely because parties disagree about a term's meaning. *Kelly v. Estate of Johnson*, 788 N.E.2d 933, 935 (Ind. Ct. App. 2003); *see also East v. Estate of East*, 785 N.E.2d 597, 601 (Ind. Ct. App. 2003) ("The lack of clarity upon a casual reading of an instrument is not sufficient grounds to determine whether the instrument is ambiguous. Nor is an instrument ambiguous merely because it may be difficult to construe." (citations omitted)).

Language is ambiguous only if reasonable people could come to different conclusions as to its meaning. *Univ. of S. Ind. Found. v. Baker*, 843 N.E.2d 528, 532 (Ind. 2006). "[W]here an instrument is ambiguous, all relevant extrinsic evidence may properly be considered in resolving the ambiguity." *Id.* at 535. "If a contract is ambiguous or uncertain and its meaning must be determined by extrinsic evidence, its construction is a matter for the fact finder." *Town of Plainfield v. Paden Eng'g Co., Inc.*, 943 N.E.2d 904, 909 (Ind. Ct. App. 2011).

Regarding OWW's breach of contract claim, OWW's summary judgment motion asserts that the term "referrals" in the Referral Agreement applies to locations, entities and individuals referred by OWW. Moorehead opposes this motion and

moves for partial summary judgment, maintaining that the term "referrals" in the Referral Agreement is limited to locations referred directly by OWW, signed up by Moorehead, and approved by Verizon. OWW also moves for summary judgment as to the meaning of the term "activation" in the Referral Agreement, arguing it means all activations, regardless of service provider, type of service, or length of service plan. Moorehead takes a more restrictive view of this term, arguing that "activation" includes only cellular phone activations for two year service contracts with Verizon. The parties also differ on the duration of the Referral Agreement. Finally, Moorehead moves for summary judgment on the breach of contract claim, asserting that OWW abandoned the Referral Agreement. The Court will address each of these issues in turn.

### "Referrals"

OWW contends that the term "referrals" in the Referral Agreement "includes locations, individuals, and entities, anything that helps [Moorehead] grow its business and which results in activations and upgrades." (DE# 87 at 27.) OWW claims that if a referred individual or entity results in store locations approved by Verizon, OWW is entitled to referral fees for all activations and upgrades sold at those stores.

OWW relies upon the following sentence in the Referral Agreement to insist that "referrals" means locations,

-14-

individuals or entities: "For all handoffs/referrals from OWW, dating back to Jan. 1, 2006 and any locations that are approved following that date as a direct result of an OWW referral, we will pay a referral bonus in the amount described below." (DE# 95-1 at 2.) OWW interprets this sentence as having two separate categories warranting payment of a referral fee: (1) all handoffs/referrals from OWW dating back to January 1, 2006, and (2) any locations that are approved following that date as a direct result of an OWW referral. OWW argues that "handoffs/referrals" is not limited, and that, in the second phrase, "referral" means more than a referred location because multiple "locations" would not result from a single "OWW referral." OWW also cites a definition of "referral" to support its expansive interpretation of the term: "1: the act, action, or an instance of referring . . . . ; 2: one that is referred." Merriam-Webster Dictionary Online, *available at* http://www.merriam-webster.com/dictionary/referral (last visited March 13, 2015). Finally, OWW points to one referral identified in the Referral Agreement that does not include a street address, *i.e.,* "Street Kicks - Tony Baaklini – Harrisburg, PA," as evidence that referrals are not limited to specific locations, but rather, include referred entities and individuals.[4]

---

[4] OWW also cites to extrinsic evidence, including deposition testimony and

Moorehead concedes that the eleven locations (ten locations with street addresses, plus "Street Kicks – Tony Baaklini – Harrisburg, PA") identified in the Referral Agreement qualify as referrals, and, to the extent that they were opened and generated activations and upgrades, would be eligible for payment. (DE# 93 at 4-5.) Moorehead also concedes that it would be obligated to pay referral fees for additional locations not included in the Referral Agreement if OWW referred those locations during the term of the Referral Agreement. (*Id.* at 5.) But the concessions stop there. Moorehead maintains that OWW's interpretation of "referrals" is overbroad to the extent it includes individuals and entities. Moorehead insists that when considered as a whole, the Referral Agreement clearly requires payment only if OWW directly refers *a location* to Moorehead that is approved by Verizon and signed up under Moorehead. The Court agrees with Moorehead.

The Referral Agreement explains its purpose in the first paragraph:

> The proposed referral fee is designed to compensate OWW for *location* handoffs and offset loss incurred from adding another carrier to their Branded Store's existing lineup. This will also include any *locations*, other than the current list of Branded Stores that are approved through Verizon and signed up

affidavits, to support its interpretation of the Referral Agreement. As explained below, because the Referral Agreement is clear and unambiguous on this issue, the Court will not consider this extrinsic evidence.

under Moorehead Communications in the future that are
referred directly to us by the OWW group.

(DE# 95-1 at 2 (emphasis added).)  The parties' intent could not

be clearer - the agreement is "designed" to compensate OWW for

referring *locations,* and to offset OWW's loss incurred from

adding another carrier to OWW's Branded Store locations.    The

Referral Agreement goes on to refer to "locations" repeatedly:

- "For all handoffs / referrals from OWW, dating
  back to Jan. 1, 2006 and any *locations* that are
  approved following that date as a direct result
  of an OWW referral, we will pay a referral
  bonus;"

- "If we chargeback any of the *referred locations*
  for a deactivation by one of their customers, OWW
  will also be charged back;"

- "Any representation required for Verizon at these
  *locations* will be conducted entirely by Moorehead
  Communications and will not be affiliated with
  the OWW group;"

- "These *locations* will be approved on a case by
  case basis by Verizon;"

- "All     support,     training,     merchandising,
  collateral,   and   commission   payout   to   these
  approved   *locations*,   will    be    supplied    by
  Moorehead;"

- ."List of *Referred locations* as of Jan. 9th,
  2006;" and

- "Moorehead will help with Signage build-out in
  select *locations*. . .  This will however, be
  approved on a case by case basis and will require
  a minimum number of activations per month, per
  *location.*"

(*Id.* at 2-3 (emphasis added).) In contrast, the Referral Agreement makes no reference to compensating OWW for referring "individuals" or "entities," or, as OWW claims in its opening brief, "anything that helps [Moorehead] grow its business."

OWW's broad interpretation of "referrals" ignores the stated purpose of the Referral Agreement, and takes a single sentence out of context to support its entitlement to fees for referrals of individuals and entities. This the Court cannot do. *See Citimortgage,* 975 N.E.2d at 813 (court must construe contract so as to render each word, phrase, and term "harmonious with the whole."). Reading "referrals" as applying to any individuals or entities referred by OWW does not make sense, especially in the broader context of the Referral Agreement. *See Pittman v. Max H. Smith Farms, Inc.*, 506 N.E.2d 1139, 1141 n.3 (Ind. Ct. App. 1987) ("This court will use common sense justice and the probable intention of the parties to construe a contract." (citation omitted)). While OWW claims that "handoffs / referrals" in the phrase, "all handoffs / referrals from OWW dating back to Jan. 1, 2006," is not limited, the first paragraph of the Referral Agreement clarifies that the referral fee is designed to compensate OWW for "*location* handoffs." *See Kelly*, 788 N.E.2d at 935 ("the text of a disputed provision may be understood by referring to other provisions within the four corners of the document"). In arguing that "referrals" must

include individuals and entities because a single "referral" cannot provide multiple "locations," OWW elevates form over substance. "[T]he Court is not at liberty to ignore clear and unambiguous language evincing the intent of the parties. Thus, where language is clear and unambiguous, the Court will not indulge in a hyper-technical, unduly-critical construction of [a] clause." *BMD Contractors, Inc. v. Fid. & Deposit Co. of Md.,* 828 F. Supp. 2d 978, 986-87 (S.D. Ind. 2011), *aff'd,* 679 F.3d 643 (7th Cir. 2012).

The Court also disagrees with OWW's claim that the identification of "Street Kicks – Tony Baaklini – Harrisburg, PA" supports its interpretation of "referral" as an individual or entity. As Moorehead notes, this referral is listed under the title "List of Referred *Locations* as of Jan. 9th, 2006 (Pending Approval)." (DE# 95-1 at 3 (emphasis added).) The lack of a street address for this referral does not undermine the parties' intent that the Referral Agreement apply to referred locations. The Referral Agreement contemplates that OWW would refer locations to Moorehead "in the future," demonstrating the parties' intent that OWW would provide Moorehead with additional information after the Referral Agreement was executed.

The Court finds the Referral Agreement to be unambiguous as to the meaning of the term "referrals," despite the parties'

dispute over it. *See Kelly*, 788 N.E.2d at 935 (a document is not ambiguous merely because parties disagree about a term's meaning). Looking at the Referral Agreement as whole, it is clear that the parties intended "referrals" to mean only referred locations, and not referred individuals or entities. Because the Court is able to determine the parties' intent by reviewing the language contained within the four corners of the Referral Agreement, it will not consider extrinsic evidence. *See John M. Abbott*, 14 N.E.3d at 56 (where contract language is unambiguous, extrinsic evidence is inadmissible to expand, vary, or explain the contract).

To the extent OWW seeks referral fees based solely on the referral of the individuals and entities, rather than locations, those claims are rejected. These include, but are not limited to, the claims based on the referral of Kapp and Trimble.[5] Because 'referrals' are referred locations, and not referred individuals or entities, OWW is not entitled to referral fees from additional locations or relocated stores opened by an individual or entity, unless OWW referred those additional or new locations.

---

[5] OWW also seeks fees for certain referrals as both referred individuals and referred locations, including Forsyth and former OWW employee Mike Perago ("Perago"). (*See* DE# 94 at 15.) While OWW is not entitled to fees for referring Forsyth or Perago as individuals, it may be entitled to fees based on referrals of their locations.

The Referral Agreement states that OWW will be paid a referral fee for any locations that are approved by Verizon after January 1, 2006, as a "direct result" of an OWW referral. (DE# 95-1 at 2.) OWW contends that it made referrals to Moorehead in the Referral Agreement, the Annibali Email, the Term List, and in verbal communications. (DE# 87 at 14-21.) OWW insists that it is entitled to fees for referring specific OWW locations to Moorehead in the Annibali Email because Moorehead acknowledges that if a location listed in the Annibali Email was signed up under Moorehead and approved by Verizon, then OWW would be entitled to referral fees. (DE## 94 at 18-19, 96-6 at 7.) Moorehead argues that OWW has not proffered evidence showing: (1) that the alleged "referred" locations identified in the Annibali Email, the Term List, or in verbal communications were actually operating; (2) for those locations that match Moorehead dealer locations, when the Moorehead locations were opened; or (3) a causal connection between a referral and the actual opening of a location. (DE# 95-3 at 5.)

The parties also dispute Chinh's role in his interactions with Moorehead after Chinh sold his interests in the OWW companies to Chau. OWW asserts that it hired Chinh as a consultant after he sold his interests in the OWW companies, and that Chinh's main focus as a consultant was growing the Referral Agreement. As OWW's consultant, Chinh was allegedly instructed

to make referrals to Moorehead and build the Verizon referral network. OWW cites Chau's deposition testimony, affidavits from Chinh, and email correspondence between Chinh and Moorehead in 2007-2008, to support these allegations. (*See, e.g.,* DE## 89-1, 89-2 at 13, 89-3 at 12-13, 96-9.) Moorehead disputes these assertions, and claims that Chinh pursued his own interests after he sold his interest in OWW to Chau. Among other things, Moorehead points to 2007 email correspondence between Chinh and Moorehead in which Moorehead advises Chinh that he must distance himself from OWW. (*See, e.g.,* DE## 95-9 at 3 ("you will have to show that you have no stake in OWW"), 95-10 at 2 (Chinh's corporate offices "can't be at the same location as OWW").) A genuine issue of material fact exists as to whether Chinh was acting on OWW's behalf in his interactions with Moorehead after he sold his interests in the OWW companies.

The Court finds that, aside from the locations conceded by Moorehead, genuine issues of material fact exist regarding which locations entitle OWW to referral fees under the Referral Agreement.[6]

Finally, OWW argues that it is entitled to a referral fee if it referred a location to Moorehead, and Moorehead "plugged"

---

[6] Moorehead concedes that five of the eleven referred locations identified in the Referral Agreement were signed up by Moorehead or had sufficient activations or upgrades to warrant payment. (DE# 93 at 4-5.) Moorehead also admits its obligation to pay referral fees for one OWW location not listed in the Referral Agreement, specifically, 1910 Fruitville Pike in Lancaster, operated from April through October 2006. (*Id.* at 5.)

a new agent into that location. As Moorehead points out, OWW has identified no locations that satisfy this scenario. OWW claims that it is entitled to a declaration of this right, noting that Moorehead has compensated OWW under these circumstances in the past. (*See* DE# 103 at 6 (asserting Moorehead paid OWW referral fees after a new agent "took over the Furnace Hill Road location").) Neither party cites any case law on this issue.

Indiana courts "allow the pursuit of declaratory judgment if the judgment would effectively solve the problem involved and no traditional remedy would be as effective or efficient in resolving the dispute." *Dometic Corp. v. Liberty Mut. Ins. Co.*, No. 1:06-CV-1260-DFH-TAB, 2008 WL 4443234, at *2 (S.D. Ind. Sept. 26, 2008) (citing *Ferrell v. Dunescape Beach Club Condo. Phase I, Inc.,* 751 N.E.2d 702, 707-08 (Ind. Ct. App. 2001)). The determinative factor is whether issuing a declaratory judgment will result in a just and more expeditious and economical determination of the entire controversy. *Id.* Revisiting the issue of referral fees when a new agent takes over a referred location would waste everyone's time and resources. Therefore, the Court finds that OWW is entitled to referral fees for activations and upgrades at locations directly referred by OWW that are approved through Verizon and signed up

under Moorehead, even if a new agent takes over that location, for the duration of the Referral Agreement.[7]

<u>"Activation"</u>

Having determined that, for purposes of the Referral Agreement, "referrals" mean only referred locations, the Court turns to the issue of what constitutes an "activation" for which a referral fee is due. OWW moves for summary judgment on this issue, arguing that because the Referral Agreement does not contain language limiting the term "activation," OWW is "entitled to a fee on all activations resulting from a referral without limitation including, but not limited to 1-year activations, 2-year activations, no term [or "prepaid"] activations, voice activations, data activations, DISH activations, and reactivations." (DE# 87 at 26.)

<u>Activations with Different Service Providers</u>

The Court will first address OWW's claim that it is entitled to referral fees for activations with DISH Network because the term "activation" is not limited in the Referral Agreement. Moorehead responds that the Referral Agreement has nothing to do with DISH Network. Rather, the Referral Agreement centers around approval by Verizon, and thus, the parties intended "activation" to include only activations with Verizon,

---

[7] As explained in more detail below, the meaning of the term "activation" and the duration of the Referral Agreement are genuine issues of material fact precluding summary judgment.

not DISH Network. Looking at the four corners of the Referral Agreement, the Court agrees with Moorehead.

The Referral Agreement requires Verizon's approval of referred locations in order for OWW to be eligible to receive a referral fee:

> The proposed referral fee is designated to compensate OWW for location handoffs and offset loss incurred from adding another carrier to their Branded Store's existing lineup. This will also include any locations, other than the current list of Branded stores that are *approved through Verizon* and signed up under Moorehead Communications in the future that are referred directly to us by the OWW group.

(DE# 95-1 at 2 (emphasis added).) The section entitled, "Monthly Activations for the referred group," provides tiers of referral fees "per activation." (*Id.*) The Referral Agreement goes on to state that "[a]ny representation *required for Verizon* in these locations, will be conducted entirely by Moorehead. . . . These locations will be *approved on a case by case basis by Verizon*. . . ." (*Id.* (emphasis added).) The Referral Agreement does not mention DISH Network, or any carrier other than Verizon. Reading the contract as a whole, the Court finds that the parties intended the Referral Agreement to address activations with Verizon, and only Verizon. *See Citimortgage, Inc.,* 975 N.E.2d at 813 (goal of contract interpretation is to determine parties' intent when they made agreement). The Court

therefore rejects OWW's claim that "activations" includes activations with DISH Network.

### Types of Activations

The Referral Agreement states that OWW will receive a "referral bonus per activation," depending on the number of activations per month. (DE# 95-1 at 2.) It does not define the term "activation," or qualify it by any type of service or length of service plan. OWW asserts that because the term "activation" is not limited in the Referral Agreement, it encompasses all activations, regardless of the type of service (*i.e.*, cellular and data), or length of service plan (*i.e.,* one-year service plans, two-year service plans, and prepaid). Under OWW's interpretation, a single phone with cellular service and data services would entitle OWW to referral fees for multiple activations.

Moorehead argues that "activation" means only a two-year post-paid cellular phone activation, and does not include data activations, or activations for prepaid or one-year cellular phone plans. Moorehead asserts that any ambiguity regarding the term "activation" should be resolved by reference to wireless industry practice. Indiana courts have held that,

> a contract made with reference to a particular business is presumed to have been made with reference to the known usage or general course of such business. Thus, in the absence of an agreement to the contrary, usage may reasonably be supposed to have entered into

and formed part of their contracts . . . in relation
to such business, and the parties' contracts are to be
interpreted consistent with such usage.

*Clark Adver. Agency, Inc. v. Avco Broad. Corp.,* 383 N.E.2d 353, 356 (Ind. Ct. App. 1978) (citations omitted); *see Todd v. Howell*, 95 N.E. 279, 280 (Ind. Ct. App. 1911) ("Peculiar expressions or terms are to be given the meaning which they have acquired in such business by common usage, unless, by the express terms of the contract, such usage is excluded, or is inconsistent with the contract."). Where a word used in a contract has "a peculiar trade meaning, parol evidence is admissible to explain such trade meaning." *Southwestern Milling Co. v. Niemeier*, 131 N.E. 831, 831 (Ind. Ct. App. 1921); *see generally Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837 (2015) (noting that sometimes, "when a written instrument uses technical words or phrases not commonly understood, those words may give rise to a factual dispute. If so, extrinsic evidence may help to establish a usage of trade or locality.") (quotations omitted). "[I]f language of the contract is ambiguous, or if technical words, local phrases or terms of art are used and evidence is properly admitted showing meaning, the question becomes one of fact." *Ecorp, Inc. v. Rooksby,* 746 N.E.2d 128, 131 (Ind. Ct. App. 2001) (quotation omitted); *see Walker v. Trailer Transit Inc.,* 1 F. Supp. 3d 879, 884 (S.D. Ind. 2014) (finding question of material fact requiring

extrinsic evidence as to what charges constitute "special services" and "special administrative costs" in trucking industry).

Here, Moorehead proffers evidence in the form of deposition testimony of its Rule 30(b)(6) witness and another Moorehead employee that "activation" means a two-year post-paid activation in the wireless industry; that nobody in the wireless industry considers data service or data add-ons to be "activations;" that neither Verizon nor Moorehead considers prepaid service to be an "activation;" and that prepaid service is not included in Verizon's Key Performance Indicators. Regarding whether "activation" includes data service, Moorehead points to the testimony of Forsyth and Golob indicating that activations and upgrades were based on "total phones," rather than the type of service activated.

OWW responds by discounting the deposition testimony cited by Moorehead as taken out of context. OWW also relies on other deposition testimony of Moorehead's Rule 30(b)(6) witness to assert that the Referral Agreement doesn't distinguish between one-year and two-year activations, that OWW is entitled to be paid on one-year activations and reactivations, and that Moorehead does not have other referral agreements and is unaware of other referral agreements in the industry. OWW also cites evidence that sub-dealers were paid commissions for prepaids and

one-year service contracts and were allowed to collect activation fees. OWW does not claim that "activation" has no particular meaning in the wireless industry, but rather, asserts that "[v]ague industry practice that does not exist is not relevant to what the parties in this case intended." (DE# 103 at 9.)[8]

Construed in the light most favorable to Moorehead as the non-moving party, the Court finds that there is a genuine issue of material fact as to the meaning of the term "activation" in the Referral Agreement. *See Ecorp, Inc.,* 746 N.E.2d at 132 (reversing summary judgment where, "[g]iven the technical nature of the term used, reasonable people could arrive at different conclusions about the meaning of 'recapitalization' in Rooksby's employment contract"). The Court therefore **DENIES** OWW's motion for summary judgment on this issue.

---

[8] OWW also asserts that any ambiguity regarding the term "activation" should be construed against Moorehead as the drafter of the Agreement. In Indiana, any ambiguities in a contract are to be construed against the drafter. *See Heartland Crossing Found., Inc. v. Dotlich,* 976 N.E.2d 760, 763 (Ind. Ct. App. 2012). However, the Court questions OWW's premise that the rule of construing ambiguities against the drafter gives it a license to bypass relevant, extrinsic evidence in favor of declaring judgment for the non-drafter. As the case cited by OWW for this proposition states, "the language creates an ambiguity, construed against the drafter, *for a fact-finder to resolve.*" *Warrick Cnty. ex rel. Conner v. Hill*, 973 N.E.2d 1138, 1144 (Ind. Ct. App. 2012) (citation omitted, emphasis added). Similarly, here, the Court finds the meaning of "activation" to be an issue for the fact-finder.

<u>Duration of Referral Agreement</u>

The parties agree that the Referral Agreement contains no express termination date, and no statement that it will remain in force indefinitely. (*See* DE# 87 at 24, DE# 93 at 10.) This begs the question, what is the duration of the Referral Agreement? OWW asks the Court to find that the Referral Agreement remains a valid agreement going forward, and that future payments are due for referrals by OWW indefinitely. Moorehead argues that, because the Referral Agreement has no termination date, it is terminable at will by either party.

Indiana courts have held that "a contract containing no specific termination date is terminable at will and that where the parties fix no time for the performance or discharge of obligations created by the contract they are assumed to have had in mind a reasonable time." *City of E. Chicago, Ind. v. E. Chicago Second Century, Inc.,* 908 N.E.2d 611, 623 (Ind. 2009). "What constitutes a reasonable time depends upon the subject matter of the contract, the circumstances attending performance of the contract, and the situation of the parties to the contract." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., U.A.W. v. Randall Div. of Textron, Inc.*, 5 F.3d 224, 230 (7th Cir. 1993) (quoting *Fraternal Order of Police Lodge No. 52 v. City of Elkhart*, 551 N.E.2d 469, 472 (Ind. Ct. App. 1990)). Determining the point at which a party's

contractual obligation terminated is a triable issue of fact that precludes summary judgment. *See id*.

Citing no Indiana law, OWW asserts that the Referral Agreement remains in effect so long as a store location is open and selling activations and upgrades. (*See* DE# 103 at 6.) In support of its position, OWW cites *Warner-Lambert Pharmaceutical Co. v. John J. Reynolds, Inc.*, 178 F. Supp. 655 (S.D.N.Y. 1959), and *Lura v. Multaplex, Inc.*, 129 Cal. App. 3d 410 (Cal. App. Ct. 1982). (*Id*. at 7–8.) In *Warner-Lambert*, the agreements at issue provided that the plaintiff would pay the defendants a monthly royalty fee for every gross of Listerine sold. 178 F. Supp. at 658. The agreements did not provide for a length of time during which they would continue in effect. *Id*. at 660. The plaintiff claimed that because the agreements were indefinite as to duration, its obligation to make payments to the defendants under the contract was terminated by the public disclosure of the Listerine formula. The New York federal district court found that the agreements were not infinite in duration. The court also found that, pursuant to the language of the agreements, the plaintiff's obligation to pay continued so long as it manufactured and sold Listerine; "the plaintiff has the right to terminate its obligation to pay whenever in good faith it desires to cease the manufacture and sale of Listerine." *Id*. at 662–63.

In *Lura*, Multaplex agreed to pay Lura commissions for assisting Multaplex in obtaining various business accounts, and the terms of the agreement were set out in a memorandum. 129 Cal. App. 3d at 412. The parties neither discussed nor reached an understanding as to the duration of the agreement. *Id*. Several years later, Multaplex notified Lura of its intent to terminate his commission payments, indicating that full and reasonable compensation had been paid for his services. *Id*. At that time, Multaplex continued to conduct business with the accounts solicited by Lura. *Id*. The California appellate court rejected Multaplex's argument that because the contract was silent as to duration, it extended only for a reasonable time. *Id*. at 413-14 (citing *Warner-Lambert*, 178 F. Supp. 665). The court explained that "[s]ince respondent's obligation to appellant is contingent upon its sales to the accounts he secured, the agreement is of a limited duration – until respondent stops selling to those accounts." *Id*.

Neither *Warner-Lambert* nor *Lura* was decided under Indiana law, and no Indiana court has cited either opinion. While not directly on point, at least one case indicates that Indiana courts would not be inclined to follow *Warner-Lambert* or *Lura*. In *Marksill Specialties, Inc. v. Barger,* 428 N.E.2d 65 (Ind. Ct. App. 1981), the parties disputed the duration of an agreement to pay commissions. The agreement did not include a termination

date, but stated that "[t]his agreement is valid and payment shall continue as long as _____ sells any product to any company listed." *Id*. at 67. Marksill contended that the agreement was terminable at will because it contains no specific termination date. The Indiana Court of Appeals found that the agreement did not fall within the category of contracts having no termination date because, "[a]lthough a date is not specified, the representative agreement *does contain a provision that sets out a condition* which would terminate Marksill's obligations." *Id*. at 69 (emphasis added). The condition was the discontinuance of the sale of certain products to certain companies. "The representative agreement, *containing a provision for termination*, is terminable in accordance with its terms and not at the will of either party." *Id*. (emphasis added). The Indiana court relied on the fact that the contract contained a provision setting a condition for termination to find that it was not terminable at will. *See id.; see also Made2Manage Sys., Inc. v. ADS Info. Sys., Inc.,* No. 1:02-cv-1405-LJM-WTL, 2003 WL 21508235, at *4 (S.D. Ind. June 24, 2003) ("when a contract contains specific provisions that provide for termination, the contract is terminable only in accordance with those provisions and not at the will of either party, even if there is no specific termination date") (citing *Marksill*, 428 N.E.2d at 69).

Here, the Referral Agreement does not contain a specific termination date, or any provision setting out a condition that would terminate Moorehead's obligations. Therefore, in accordance with Indiana law, the Court finds that the Referral Agreement is terminable at will. *See City of E. Chicago,* 908 N.E.2d at 623. While Moorehead and OWW have proffered evidence of the circumstances attending the performance of the Referral Agreement, determining the point at which their contractual obligations terminated is a triable issue of fact. Therefore, OWW's motion for summary judgment as to the duration of the Referral Agreement is **DENIED**. *See Randall Div. of Textron,* 5 F.3d at 230.

### Abandonment of the Referral Agreement

Moorehead moves for partial summary judgment on OWW's breach of contract claim, arguing that OWW abandoned the Referral Agreement.

> The abandonment of a contract is a matter of intention to be ascertained from the facts and circumstances surrounding the transaction from which the abandonment is claimed to have resulted. Abandonment may be inferred from the conduct of the parties, and a contract will be treated as abandoned when one party acts inconsistently with the existence of the contract, and the other party acquiesces.

*Estate of Kappel v. Kappel*, 979 N.E.2d 642, 643 (Ind. Ct. App. 2012) (citations and quotations omitted). Moorehead relies upon three facts to show that OWW intended to abandon the Referral

Agreement. First, OWW never reviewed or objected to the monthly accountings provided by Moorehead. Second, Chau attempted to negotiate a new referral agreement with Moorehead in 2008 on behalf of Chau's new company, United Consulting. Third, during discovery, Chau altered a 2008 email to Moorehead by deleting references to United Consulting and Wireless Advisors (companies operated by Chau and Chinh, respectively). Moorehead asserts that this alteration during discovery concealed that OWW had abandoned the Referral Agreement.

OWW responds that it never intended to abandon the Referral Agreement, and argues that multiple issues of fact preclude summary judgment. Regarding Moorehead's accountings, Chau testified that OWW representatives would verify that Moorehead's "numbers . . . made sense" by periodically asking agents how they were "doing with Verizon." (DE# 96-5 at 3.) OWW asserts that it continued to make referrals and perform under the Referral Agreement, citing emails with Moorehead regarding referred locations in January 2008. OWW acknowledges that altering the email between OWW and Moorehead was improper, but insists it did not reflect OWW's intent to abandon the Referral Agreement. Chau testified that this email communicated where Moorehead was to send payments due to OWW. (*See* DE# 96-11 at 4-5.) OWW argues that there was nothing improper about OWW asking Moorehead to direct payments due to OWW to other parties.

"Abandonment of a contract is a mixed question of law and fact; that is, what constitutes abandonment is a question of law and whether there has been abandonment is a question of fact." *Kappel*, 979 N.E.2d at 652 (citation omitted). Taken in the light most favorable to OWW as the nonmoving party, the Court finds that there are genuine issues of material fact regarding whether OWW abandoned the Referral Agreement. Therefore, the Court **DENIES** Moorehead's motion for partial summary judgment on the issue of abandonment.[9]

Damages

OWW asks the Court to award it damages in the amount of more than $23 million. For the reasons set forth above, the Court denies OWW's motion for summary judgment on its breach of contract claim, and finds that genuine issues of material fact preclude summary judgment on certain issues, including which types of service and service plans constitute "activations" under the Referral Agreement, and the duration of the Referral

---

[9] OWW also argues that Moorehead waived its abandonment defense by failing to plead it as an affirmative defense in its Answer. *See Am. Family Ins. Grp. v. Ford,* 293 N.E.2d 524, 525 (Ind. Ct. App. 1973) ("cancellation . . . defense is one of confession and avoidance, an affirmative defense which must be specially pleaded"). OWW maintains that it is too late for Moorehead to argue a defense on summary judgment that was never raised in a pleading. Because the Court finds that genuine issues of material fact preclude summary judgment on the abandonment issue, it need not address this waiver argument directly. However, the Court notes that "[t]he failure to plead an affirmative defense in the answer works a forfeiture only if the plaintiff is harmed by the defendant's delay in asserting it." *Garofalo v. Vill. of Hazel Crest*, 754 F.3d 428, 436 (7th Cir. 2014) (citation omitted). Courts have found no waiver of an affirmative defense and no abuse of discretion in allowing the argument to be raised at the summary judgment stage where plaintiffs had the opportunity to challenge the argument in their summary judgment briefs. *See, e.g., id.* at 436–37.

Agreement.  The amount of damages to which OWW is entitled (if any) cannot be determined until these issues are resolved by a trier of fact.  Therefore, OWW's motion for summary judgment on the issue of damages is **DENIED**.


Count II:  Accounting Claim

Count II of OWW's Verified Complaint seeks an "accounting of all activations and upgrades in connection with any handoff/referral from OWW," including "all activations and upgrades for any locations subsequently opened in connection with the handoffs/referrals from OWW" from January 2006 to the present.  (Comp. ¶¶ 27-29.)  "Generally, an action for an accounting is a proceeding in equity and is addressed to the sound discretion of the trial court." *Lily, Inc. v. Silco, LLC,* 997 N.E.2d 1055, 1076 (Ind. Ct. App. 2013) (citations omitted). An action for an accounting has the purpose of adjusting the account of the litigants and of rendering complete justice in a single action.  *Id.*  "A court may refuse to award an equitable accounting to a party who has an adequate remedy at law." *Grant v. Van Natta*, No. 1:10–cv–01220–MJD–LJM, 2013 WL 466212, at *10 (S.D. Ind. Feb. 7, 2013) (quoting *First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir. 1985)).

Moorehead seeks dismissal of OWW's accounting claim, arguing that OWW has an equitable remedy at law:  damages for any alleged breach of the Referral Agreement.  Moorehead also asserts that the accounting claim should be dismissed because Moorehead has already produced voluminous documents showing phone activation and upgrade data for various locations.  OWW contends that Moorehead's argument fails if the sums due to OWW exceed the scope of the contract, and maintains that it is entitled to an accounting "depicting all activations/upgrades, etc. . . . to support past, present, and future payments due to OWW."  (DE# 94 at 25.)

Presumably, the documents produced by Moorehead do not account for activations and upgrades sold since those documents were produced.  As explained above, a genuine issue of material fact exists regarding the duration of the Referral Agreement.  Until the finder of fact has determined the Referral Agreement's duration, it is premature to decide the accounting claim.  Under these circumstances, the Court concludes that there is a question of fact with respect to the account claim.  *See Lily, Inc.*, 997 N.E.2d at 1076.  Thus, Moorehead's motion for partial summary judgment on Count II is **DENIED**.

Count III:  Unjust Enrichment Claim

OWW and Moorehead submit cross-motions for summary judgment on OWW's unjust enrichment claim.  OWW acknowledges that, to the extent it obtains complete relief on Count I, its unjust enrichment claim is moot, but argues that if OWW is granted "something less than full relief on Count I, then OWW seeks the balance of its damages under its unjust enrichment claim." (DE# 87 at 34.)  OWW's requested "full relief" is judgment in the amount of over $23 million, and a declaration that Moorehead remains obligated to pay OWW for all ongoing activations and upgrades following the dates of the documents produced and into the future, for all of the referrals that still operate and generate activations of any kind, and upgrades. (*See id*. at 36.)

Moorehead maintains that OWW's unjust enrichment claim should be dismissed because recovery for unjust enrichment is unavailable "where there is an express contract between the parties governing the same subject matter raised in the claim." *Kusper v. Poll Farms, Inc.,* 649 F. Supp. 2d 917, 922 (N.D. Ind. 2009) (citation omitted).

Unjust enrichment requires a party who has been unjustly enriched at another's expense to make restitution to the aggrieved party.  *Zoeller v. E. Chicago Second Century, Inc.,* 904 N.E.2d 213, 220 (Ind. 2009) (citation omitted).  "When the

rights of parties are controlled by an express contract, recovery cannot be based on a theory implied in law." *Id.* at 221 (quotation omitted). Here, OWW does not assert that it had no contract with Moorehead or that the contract was unenforceable. Rather, the parties concede to the existence and enforceability of the Referral Agreement, but differ on their interpretations of the contract.

The existence of an express contract precludes an unjust enrichment claim because: (1) the contract provides a remedy at law; and (2) a plaintiff cannot pursue an equitable remedy when there is a remedy at law. *See Coppolillo v. Cort,* 947 N.E.2d 994, 998 (Ind. Ct. App. 2011). Courts "do not sit to improve the bargains that parties freely negotiate. The existence of express terms in a valid contract thus precludes the substitution of implied terms regarding matters covered by the contract's express terms. In short, there can be no constructive contract where there is an express contract between the parties in reference to the same subject matter." *Brown v. Mid-Am. Waste Sys., Inc.,* 924 F. Supp. 92, 94 (S.D. Ind. 1996) (internal quotations and citations omitted).

In *Coppolillo v. Cort,* the Indiana Court of Appeals held that "when an express contract does not fully address a subject, a court of equity may impose a remedy to further the ends of justice." 947 N.E.2d at 998; *see also Kohl's Ind. L.P. v.*

-40-

*Owens*, 979 N.E.2d 159, 168 (Ind. Ct. App. 2012). While OWW relies heavily on *Coppolillo* to argue that it may recover damages for both breach of contract and unjust enrichment, the case is distinguishable. In *Coppolillo*, the parties had a written contract to pay a lump sum payment, as well as an oral agreement for additional monthly payments. 947 N.E.2d at 998. The court determined that because the parties did not have an agreement covering all payment arrangements, the plaintiff could pursue an unjust enrichment claim for amounts not covered by the written contract. *Id*. at 998-99.

Here, OWW fails to show that a contract covering the subject matter at issue does not exist. OWW maintains that if "OWW obtains complete relief on Count I [its breach of contract claim], the unjust enrichment claim is moot," but if "this Court grants something less than full relief on Count I, then OWW seeks the balance of its damages under its unjust enrichment claim." (DE# 87 at 34.) In doing so, OWW admits that the Referral Agreement addresses the same subject matter as its unjust enrichment claim. OWW "may not seek unjust enrichment *just in case* the contract does not afford it the relief it seeks; a valid contract still governs the parties' rights with respect to the subject matter at issue." *CoMentis, Inc. v. Purdue Research Found.,* 765 F. Supp. 2d 1092, 1103 (N.D. Ind. 2011) (dismissing unjust enrichment claim under Indiana law)

(emphasis in original). Because the Referral Agreement controls the parties' dispute over referral fees, OWW's unjust enrichment claim does not fall within the exception set forth in *Coppolillo*. *See Walker*, 1 F. Supp. 3d at 885 (finding *Coppolillo* exception did not apply where agreement addressed calculation of plaintiffs' compensation, thereby providing an adequate remedy at law); *Pain Ctr. of SE Ind., LLC v. Origin Healthcare Solutions LLC,* No. 1:13-CV-00133-RLY, 2014 WL 6750042, at *6 (S.D. Ind. Dec. 1, 2014) (dismissing unjust enrichment claim where alleged conduct fell within the scope of the parties' agreements). For these reasons, the Court **DENIES** OWW's motion for summary judgment and **GRANTS** Moorehead's motion for partial summary judgment as to OWW's unjust enrichment claim. Count III of OWW's complaint is hereby **DISMISSED**.[10]

Moorehead's Motion to File Exhibits in Opposition to Summary Judgment under Seal

Moorehead seeks approval to file certain pages of its response brief to OWW's summary judgment motion, as well as unredacted designations to its response brief, under seal. OWW does not oppose this motion.

---

[10] Because the Court rules in Moorehead's favor, it need not address Moorehead's alternative argument that OWW provides no evidence of any benefit actually conferred to Moorehead. *See Reed v. Reid*, 980 N.E.2d 277, 296 (Ind. 2012) (to prevail on an unjust enrichment claim, a plaintiff must show it rendered a measurable benefit to the defendant at the defendant's express or implied request) (citation omitted).

Northern District of Indiana Local Rule 5-3 provides that "[t]he clerk may not maintain a filing under seal unless authorized to do so by statute, court rule, or court order." N.D. Ind. L.R. 5-3(a) (2014). There is no statute, rule, or order providing for sealed filings in this case. The Seventh Circuit has held that, although there is a general presumption that judicial records are public, that presumption "can be overridden" by "the property and privacy interests of the litigants . . . if the latter interests predominate in the particular case" such that "there is good cause for sealing a part or the whole of the record." *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.,* 178 F.3d 943, 945 (7th Cir. 1999). Notwithstanding an agreement of parties to seal documents, the decision of whether good cause exists to file a document under seal rests with the Court. *See id.* Good cause may exist if the documents are sealed in order to maintain the confidentiality of trade secrets, privileged information (such as information covered by the attorney-client privilege), and non-public financial and business information. *See Baxter Int'l, Inc. v. Abbott Lab.,* 297 F.3d 544, 546 (7th Cir. 2002); *Metavante Corp. v. Emigrant Sav. Bank,* No. 05-CV01221, 2008 WL 4722336, at *9 (E.D. Wis. Oct. 24, 2008). In this case, Moorehead has good cause for filing under seal a settlement agreement between OWW and Sprint Solutions, Inc., stock purchase

agreements containing sale prices for OWW and related companies, and OWW Consulting's 2007 tax return, as these documents contain non-public financial and business information. *See Formax Inc. v. Alkar-Rapidpak-MP Equip., Inc.,* No. 11-C-0298, 2013 WL 2452703, at *1 (E.D. Wis. June 5, 2013) ("documents containing sensitive pricing information, sales figures, sales dollar amounts, profit and loss data, and other financial records not normally made known to the public may be properly filed under seal") (citation omitted); *Reassure Am. Life Ins. Co. v. Isermann,* No. 07-CV-829, 2008 WL 168666, at *1-*2 (E.D. Wis. Jan. 17, 2008) (granting motion to file under seal materials containing confidential information including financial and tax return information); *Kay Beer Distrib., Inc. v. Energy Brands, Inc.,* No. 07-C-1068, 2009 WL 3790202, at *1 (E.D. Wis. Nov. 12, 2009) (granting request to seal confidential settlement agreements). Therefore, Moorehead's Motion to File Exhibits in Opposition to Summary Judgment Under Seal is **GRANTED**.[11]

---

[11] The Court notes that OWW filed documents under seal without moving for approval to do so. (*See* DE## 87, 88, 96.) This is improper. *See Citizens First*, 178 F.3d at 945 ("The determination of good cause cannot be eluded by allowing the parties to seal whatever they want."); (DE# 23-1, Protective Order, ¶ 11 ("Entire pleadings must not be filed under seal. . . . Except as noted above, no Party shall file under seal . . . without previously-obtained court approval."). The documents OWW filed at Docket Entry Numbers 87, 88 and 96 shall remain under seal for thirty (30) days. Thereafter, the Court will direct the Clerk of the Court to place these documents in the public record, unless OWW makes a showing in accordance with Seventh Circuit law that the documents should remain sealed.

Moorehead's Motion to Strike

Moorehead moves to strike any testimony that OWW is currently "in the wireless industry," asserting that OWW is no longer in this industry. (DE# 99.) OWW responds by arguing, among other things, that "[w]hether OWW is actively engaged in the wireless industry is irrelevant." (DE# 104 at 1.) The Court agrees, and did not consider statements regarding whether OWW is currently in the wireless industry in deciding the parties' summary judgment motions. Thus, Moorehead's motion to strike is **DENIED AS MOOT**.


CONCLUSION

For the reasons set forth above, OWW's Motion for Summary Judgment (DE# 86) is **DENIED**, Moorehead's Motion for Partial Summary Judgment (DE# 90) is **GRANTED IN PART AND DENIED IN PART**, Moorehead's Motion to File Exhibits in Opposition to Summary Judgment Under Seal (DE# 97) is **GRANTED**, and Moorehead's Motion to Strike (DE# 99) is **DENIED AS MOOT**.


**DATED:  March 20, 2015**      **/s/ RUDY LOZANO, Judge**
                               **United States District Court**