UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

ENTERTAINMENT USA, INC.,           )
                                   )
            Plaintiff,             )
                                   )
      vs.                          )     CAUSE NO. 1:12-cv-116 RLM
                                   )
MOOREHEAD COMMUNICATIONS, INC.,    )
                                   )
            Defendant.             )

OPINION AND ORDER

This is a breach of contract action. Entertainment USA, Inc., which
(along with related companies) used the trade name One Wireless World, seeks
unpaid commissions it says One Wireless World earned by finding cell phone
dealers for Moorehead Communications, Inc. The case went to trial without a
jury in August 2016, and the parties should have gotten a decision long before
today. The assigned judge underwent two major surgeries since the trial, which
might help explain, but doesn't justify, the delay in ruling.

There is a lot to this case. It involves an agreement drafted without the
benefit of legal advice. It involves plaintiff One Wireless World, which was,
when the agreement was adopted in January 2006, the largest cellular dealer
in central Pennsylvania, but could no longer carry the Verizon product line. It
involves defendant Moorehead Communications, Inc., which agreed to pay One
Wireless World for referrals of stores that didn't want to go exclusively with the
Sprint product line. The case requires resolution of whether that referral
agreement was for a term of years or required payments as long as any referred
store was producing sales; how the agreement applied to later referrals; what

transactions at the referred stores produced an obligation to pay One Wireless World a fee; how the fees to One Wireless World were to be calculated; whether One Wireless World abandoned the agreement; and whether, as an equitable matter, One Wireless World is entitled to an accounting.

This memorandum is meant to comply with the court's obligations under Fed. R. Civ. P. 52(a)(1).

Entertainment USA is in incorporated in, and has its principal place of business in, Pennsylvania. Moorehead Communications is incorporated in, and has its principal place of business in, Indiana. Well over $75,000 is in controversy. The court has jurisdiction under 28 U.S.C. § 1332(a)(1).

The parties agree that Indiana law applies in this case. When addressing claims under a contract, a court applying Indiana law looks to the contract itself to discern the parties' intent, Citimortage, Inc. v. Barabas, 975 N.E.2d 805, 813 (Ind. 2012); Zukerman v. Montgomery, 945 N.E.2d 813, 819 (Ind. Ct. App. 2011), giving the contract's terms their clear and ordinary meaning. State Farm Mut. Auto Ins. Co. v. Cox, 873 N.E.2d 124, 127 (Ind. Ct. App. 2007).


I. History

One Wireless World is a fictitious name registered to Entertainment USA, Inc., the plaintiff in this case. One Wireless World was once the largest cellular telephone seller in central Pennsylvania. Chau Nguyen and his brother Chinh Nguyen were equal co-owners; Chinh Nguyen served as chief operating officer. One Wireless World had several dealers in several locations, selling contracts with a variety of cellular carriers: AT&T, Singular, T-Mobile, Verizon, Nextel

Partners, and Nextel Communication. Things changed dramatically in 2006, when Sprint demanded exclusivity with all of its dealers, meaning that to sell for Sprint, a dealer could sell nothing but Sprint. Verizon soon followed suit.

One Wireless World itself chose to go with Sprint, which meant it had to sever its relationships with One Wireless World dealers who chose to go with Verizon or to go in a different direction altogether. This left One Wireless World with several associations with business entities that were valueless to One Wireless World because those entities decided not to become exclusive Sprint dealers. At the same time this was happening, Moorehead Communications was trying to expand its cellular business into central Pennsylvania. One Wireless World and Moorehead Communications addressed their problems by entering into the January 2006 agreement that underlies the parties' dispute. The agreement recited its purpose this way: "The proposed referral fee is designed to compensate [One Wireless World] for locations handoffs and offset loss incurred from adding another carrier to their Branded Store's existing lineup." One Wireless World's Chau Nguyen and Moorehead's Larry Myers negotiated the referral agreement.

The agreement described Moorehead's offer as follows: "For all handoffs/referrals from OWW, dating back to Jan. 1, 2006 and any locations that are approved following that date as a direct result of an OWW referral, we will pay a referral bonus in the amount described below." Those "locations" referred to locations with non-Sprint One Wireless World dealers that couldn't continue as One Wireless World stores after One Wireless World went exclusively with Sprint. One Wireless World would be paid if it referred a

location to Moorehead, Verizon approved the location, and Moorehead signed up the location.

Chau Nguyen gave Eric Schlesselman of Moorehead a list of One Wireless World dealers that didn't want to become exclusive Sprint dealers. That list — which One Wireless World calls the "term letter" and which Mr. Schlesselman denies receiving — consisted of these locations, which were named in the referral agreement:

- 800 Calvary Road, Suite 1, Carlisle
- 110 A West Chocolate Avenue, Hershey
- Strawberry Square, 3rd and Walnut St. (no city identified)
- 155 Furnace Hills Pike, Lilitz
- Chambersberg Mall, 3055 Block Gap Road
- 32 N. Market Street, Elizabethtown
- 400 Merkel Street, Lemoyne
- 5360 Lincoln Highway (no city identified)
- 3771 Carlisle Road, Dover
- 190 Leaders Heights Plaza.

The referral agreement required Moorehead to pay a fee to One Wireless World for every activation. The parties no longer agree on how those fees were to be calculated. The referral agreement says this:

> 20$ per activation (New Activations Only) to assist with ramp up period which will remain in affect 6 months from the date this agreement is signed by both parties. After which, referral bonus will be adjusted to the appropriate tier. (See below).

The agreement then set forth various bonus fees for 50-150 activations per month, for 151-250 activations per month, for 251-350, for 351-450, for 451-500, and for more than 500. Below those bonus fees is this: "there will be a flat fee of 10$ per 2 year upgrade in addition to items listed above."

Effective January 1, 2007, Chau Nguyen and Chinh Nguyen divided the remaining One Wireless World stores between them. Chau Nguyen bought out

Chinh Nguyen's 50 percent interest in One Wireless World, and formed a new company called One Wireless World Consulting, Inc. Chinh Nguyen formed a new company called ChinhCo Inc. The brothers created two more new companies in 2007: Chinh Nguyen formed Wireless Advisors in May, and Chau Nguyen formed United Consulting in June. Neither of these new companies was associated with One Wireless World. Sprint terminated its relationship with One Wireless World in 2007, leaving One Wireless World with no agreements with any cell phone service provider. One Wireless World locations that had been selling Sprint products and service could continue to sell those products through someone approved by Sprint, but Sprint had disapproved One Wireless World. By January 15, 2008, One Wireless World wasn't operating any stores selling Sprint. No One Wireless World-branded stores remained.

Chinh Nguyen emailed Moorehead in January 2008 to ask that future payments under the agreement be divided between his new company (Wireless Advisers) and Chau Nguyen's new company (United Consulting). Before providing that email in discovery, Chau Nguyen altered it to remove the names of the companies. In any event, under the terms of the email, Moorehead would send no more referral fees to One Wireless World. The trial record leaves unclear when Moorehead learned that One Wireless World had ceased to exist.

Chinh Nguyen's role after the split is, at best, murky. He was to serve as an agent of One Wireless World and he testified that he worked as a consultant for One Wireless World. Chinh Nguyen's consulting agreement was between his company (ChinhCo) and Chau Nguyen's company (OWW Consulting). It called

for payments of $50,000 on June 1, $50,000 on June 15, $25,000 on July 1, $25,000 on August 1, $35,000 each of the first days of September, October, November, December and January, $75,000 on February 1, then $45,000 on each of the first days of March, April, May and June – a total of more than $800,000. Whether One Wireless World ever actually paid Chinh Nguyen anything for work as an agent isn't clear from the trial record.

Notwithstanding his role as a One Wireless World agent, Chinh Nguyen also tried in June 2007 to become (or for his wife to become) a Moorehead sub-dealer through a company called Wireless Advisors. Verizon demanded that Chinh Nguyen cut all ties with One Wireless World, and eventually refused to allow him to sell Verizon products. Chinh Nguyen also formed a business with Mike Kapp called "Mobile Pros," and tried to get a license to sell T-Mobile products.

At some point after the brothers split, Chau Nguyen sold T-Mobile products through another company. In February, 2008, Chau Nguyen contacted Moorehead and proposed that Moorehead enter into a new referral agreement with his new company, United Consulting. Moorehead declined that proposal.

Moorehead paid One Wireless World a total of $70,979.50 in referral fees under the agreement. One Wireless World claims entitlement to another $2,211,752.50, plus upgrades for the claimed locations through May 2013, the last month for which it has information. Moorehead sent One Wireless World two payments after suit was filed. In May 2012, Moorehead sent $45,770 (which included interest at 8 percent per annum) on the Elizabethtown store

(which did business as "Etown") for April 2008 through July 2011, when the store relocated. In September 2012, after another One Wireless World demand, Moorehead sent another $6,503.24 for referral fees relative to the Elizabethtown store for the first quarter of 2008.

## II. THE ISSUES NEEDING RESOLUTION

At the summary judgment stage, the court held that the agreement's use of the term "location" unambiguously limits the agreement to referrals of places, rather than people. Trial was needed to resolve these questions: (1) When (if ever) did the referral agreement terminate? (2) What locations were "referred" within the meaning of the referral agreement? (3) What is an "activation" warranting payment of a referral fee? (4) Did One Wireless World abandon the referral agreement? (5) What damages, if any, are due One Wireless World? (6) Is One Wireless World entitled to an accounting?

A court construing a contract under Indiana law ordinarily is limited to the plain language within the four corners of the contract. John M. Abbott, LLC v. Lake City Bank, 14 N.E.3d 53, 56 (Ind. Ct. App. 2014). Construction of an unambiguous contract is a matter of law. TW Gen. Contracting Servs., Inc. v. First Farmers Bank & Trust, 904 N.E.2d 1285, 1287–88 (Ind. Ct. App. 2009). But if reasonable people could come to different conclusions about a contract's meaning, it is ambiguous, and its meaning becomes a fact question. Univ. of S. Ind. Found. v. Baker, 843 N.E.2d 528, 532 (Ind. 2006); Town of Plainfield v. Paden Eng'g Co., 943 N.E.2d 904, 909 (Ind. Ct. App. 2011). At the summary judgment stage, the court found the referral agreement between One Wireless

World and Moorehead unambiguous with respect to "referrals" and activations with non-Sprint service providers, but ambiguous with respect to "referred locations," "activations," the duration of the referral agreement, abandonment, damages, and the equitable claim for an accounting. Entertainment USA, Inc. v. Moorehead Commc'ns, Inc., 93 F. Supp. 3d 915 (N.D. Ind. 2015).

Extrinsic evidence -- evidence outside the four corners of the contract-- is admissible to prove meaning of an ambiguous contract term. Shorter v. Shorter, 851 N.E.2d 378, 383 (Ind. Ct. App. 2006). The court's job is to discern the parties' intent at the time they made the agreement. Citimortgage, Inc. v. Barabas, 975 N.E.2d 805, 813 (Ind. 2012). When construing an ambiguous contractual provision, a court may consider extrinsic evidence such as usage in the business to which the contract relates. Ecorp, Inc. v. Rooksby, 746 N.E.2d 128, 131 (Ind. Ct. App. 2001); Clark Advert. Agency, Inc. v. Avco Broad. Corp., 383 N.E.2d 353, 356 (Ind. Ct. App. 1978).

First, some general comments on the trial evidence that affect credibility and weight. Conduct of both Chinh Nguyen and Chau Nguyen gives rise to concerns about credibility. Chau Nguyen doctored an important email. Chinh Nguyen (while purportedly serving as a very highly compensated consultant for whatever remained of One Wireless World) tried mere months into the referral agreement to get a Verizon franchise with Moorehead after learning that Verizon demanded that he have no association whatsoever with One Wireless World. Beyond basic credibility issues, their testimony was hard to follow at trial; many answers quickly moved from the topic of the question to self-laudatory narrative, especially with Chinh Nguyen. Chinh Nguyen also

displayed a troubling fogginess on dates during cross examination, while Chau Nguyen showed barely less fogginess on dates even during direct examination.

Moorehead's understanding of the contract has, to be kind, evolved over time, at least with respect to the term of the contract. Larry Myers thought when he wrote it that there was no time limitation. In January 2008, Moorehead decided there was a 2-year limitation. Moorehead's Rule 30(b)(6) witness testified in his deposition testimony that there was no time limit, then testified at trial that there was a 2-year limit. These shifting interpretations require a grain of salt to accompany the taking of Moorehead's litigation position at trial.

Next, One Wireless World objected to two portions of Michael Trimble's testimony, and the court told the parties it would rule on those objections in the final ruling. The first objection addresses Mr. Trimble's answer at lines 3-10 on page 44 when asked about the Nguyen brothers' reputation in the industry. Moorehead says One Wireless World put its (and the Nguyen brothers') reputation in issue by testifying about One Wireless World dominating the central Pennsylvania market. The court sustains One Wireless World's objection to that answer. Their testimony was very often self-laudatory, but never reached the point of placing their own reputations in issue. The next objection addresses Mr. Trimble's answer, from line 8 on page 147 through line 3 on page 148, responding to whether he knew whether something Chau Nguyen had told him had been communicated to One Wireless World dealers. The court overrules that objection. Mr. Trimble began his answer with, "I believe not," but went on to relate the facts of which he had personal

knowledge that led him to believe that the information hadn't been communicated. The court overrules that objection.

## A. Duration of the Agreement

The referral agreement doesn't specify a termination date, so its duration is a reasonable period of time. City of Chicago, Ind. v. E. Chicago Second Century, Inc., 908 N.E.2d 611, 623 (Ind. 2009); Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., U.A.W. v. Randall Div. of Textron, Inc., 5 F.3d 224, 229-230 (7th Cir. 1993). What time is reasonable turns on the contract's subject matter and the contracting parties' conduct and situation. Fraternal Order of Police Lodge No. 52 v. Civil City of Elkhart, 551 N.E.2d 469, 472 (Ind. Ct. App. 1990). The parties disagree on what is reasonable.

Moorehead says the agreement expired two years after its execution, in early 2008. One Wireless World contends the agreement was to continue as long as any referred location continued to produce activations.

The industry provides no meaningful guidance as to the term of this agreement. When the referral agreement was created, cell phone contracts were for one year or two years, Moorehead's contract with Verizon was for two years, Moorehead's contracts with dealers were for two years, but Moorehead also had other referral agreements for one year each, and residual payments from carriers to agents usually were paid over a three-year span. But this isn't a dealer contract or a customer contract. Nobody has been able to identify any comparable agreement in the industry.

To suggest that this agreement would last into perpetuity would be unreasonable, but that isn't really what One Wireless World contends. Chau Nguyen and Larry Myers, who negotiated the agreement for Moorehead, both testified that the agreement called for continuing payments as long as a referred location still was producing activations (whatever that term might mean) for Moorehead. Nothing in the agreement is inconsistent with that understanding.

But while the referral agreement can be read to live on if a dealer is still standing, its language doesn't require such a reading. And so we turn to the parties' contemporaneous dealings.

Moorehead's conduct at the time is, like its later shifting statements about the agreement's duration, conflicting. Moorehead made few monthly payments under the referral agreement after 2007. In early 2008, Mr. Myers asked why the referral fees weren't still being paid. Moorehead stopped payments to One Wireless World in mid-2008 because Moorehead's Chief Strategy Officer believed that the Referral Agreement had expired and that the locations qualifying for referral fees no longer existed. In July 2008, Chinh Nguyen asked Moorehead's Mike Kapp why Moorehead wasn't paying referral fees; Mr. Kapp responded that the referral agreement terminated in early 2008.

Much of Chinh Nguyen's conduct was inconsistent with an understanding that the agreement expired in early 2008: he kept finding people to refer to Moorehead. It also appears that Chinh Nguyen might have been willing to work against his brother's interest: he tried to become a Verizon dealer, with full understanding that Verizon would demand that he cut all ties

with One Wireless World, even as he was working under a substantial consulting agreement with One Wireless World. But it was Chau Nguyen, not Chinh, who negotiated the referral agreement, and this record provides no reason to believe Chinh Nguyen knew much of anything about the agreement's duration.

The strongest piece of evidence to support Moorehead's 2-year contention is that in February 2008, shortly after Moorehead contends the referral agreement ran out, Chau Nguyen tried to negotiate a new agreement, this one for his new United Consulting. That act was inconsistent with his asserted understanding: if he still had a referral agreement with Moorehead as a partner in One Wireless World, it would seem pointless to negotiate a new agreement for his post-One Wireless World company.

But Chau Nguyen's February 2008 conduct is only part of the evidence, and an attempt to take over the referrals to Chinh Nguyen's exclusion is of a piece with Chinh Nguyen's efforts to get a Verizon dealership, which would have required Chinh Nguyen to cut all ties with One Wireless World and his consulting agreement.

Substantial evidence supports both positions; the drafters' testimony tips the balance for the court. In light of the testimony of Chau Nguyen and Larry Myers, the court finds that Moorehead and One Wireless World intended an agreement that would live on as long as any referred location was producing activations. It remains to decide what a "referred location" is, and what an "activation" is.

*B. Referred Locations*

At the summary judgment stage, the court held the referral agreement unambiguously applied only to direct referral of locations, not to referral of dealers. Relocated locations and additional locations opened by dealers who occupied referred locations earned fees only if One Wireless World directly referred them to Moorehead. The referral agreement says that One Wireless World would be paid a referral fee for any locations that Verizon approved after January 1, 2006, as a "direct result" of a One Wireless World referral. Moorehead contends that only then-operating One Wireless World stores could be "referred" within the meaning of the agreement.

*1. Which Locations Were Referred?*

The parties agree that One Wireless World referred seven locations to Moorehead (six of which were named in the referral agreement itself):

- 32 N. Market Street, Elizabethtown (called "Etown");
- 5380 Lincoln Highway, Gap ("Wireless Extreme");
- 132 Strawberry Square, Harrisburg ("Smithmeyer Network";
- 3517 Walnut Street, Harrisburg ("Street Kicks");
- 155 (or 555) Furnace Hills Pike, Lititz ("ZHY Wireless");
- 180 Leaders Heights Plaza, York; and
- 1910 Fruitville Pike, Lancaster ("Lancaster Wireless").

Each of these locations closed years ago. Four remained open at the outset of 2007; only two remained open through the end of 2007. Moorehead made referral payments on the Elizabethtown location through July 2011.

One Wireless World contends, and Moorehead disagrees, that referral fees are due and unpaid for ten other locations.

*a. 625 (also 623) Lombard Road, Red Lion.*

This location was listed in the "Annibali email" (Plaintiff's Exhibit 11) to Moorehead, which set forth OWW locations as of December 21, 2006. Moorehead's Mr. Schlesselman returned that list, annotated by colors to reflect Verizon's decision process, 6 days later. The Red Lion was highlighted in yellow on the list Mr. Schlesselman returned, meaning that Verizon had approved the location.

The Red Lion store didn't open in December 2006; post-agreement sales activity didn't begin there until December 2007. It also appears that this wasn't a One Wireless World store before Moorehead took over; it had been a store operated by Better Deal Cellular, a competitor of One Wireless World.

In sum, One Wireless World referred the Red Lion location to Moorehead, but it wasn't operating as a One Wireless World store when it was referred.


*b. 582 Shrewsbury Commons, Shrewsbury.*

This location, too, was listed in the Annibali email, and highlighted in yellow (meaning Verizon had approved it) in Mr. Schlesselman's return email. Chinh Nguyen testified that he helped negotiate the lease for this location, but according to Plaintiff's Exhibit 38, apparently did so in June 2007. John Forsyth testified that this store wasn't open in December 2006. Moorehead contends that before December 2006, this location was a Better Deal Cellular store, not a One Wireless World store.

One Wireless World referred the Shrewsbury store to Moorehead. The Shrewsbury store wasn't operating as a One Wireless World store when it was referred.

   *c. 5201 Sprint Road, Shermansdale ("Wireless Way").*

   *d. 141 S. Alleghany Street, Bellefonte (Wireless Made Simple").*

   *e. 500 Galleria Drive, Suite 151, Johnstown ("Accent on Communications").*

One Wireless World says it referred Wireless Way, Wireless Made Simple, and Accent on Communications to Moorehead in what One Wireless World describes as the "term letter." The term letter requires additional discussion.

The referral agreement itself identified several One Wireless World locations. Others were identified in the Annibali email – a December 21, 2006 mail from One Wireless World's Jason Annibali to Moorehead's Eric Schlesselman with an attachment labeled "One Wireless World – LOCATIONS" and identifying 37 locations (Plaintiff's Exhibit 11). One Wireless World contends that it referred other locations, including Wireless Way, Wireless Made Simple, and Accent on Communications, through what it calls the term letter (Plaintiff's Exhibit 14), which appears to be an undated list of 25 dealers under the heading, "DEALERS WHO WILL BE RECEIVING TERM LETTER" – apparently meaning dealers who, because of Sprint's exclusivity requirement, were to be terminated from association with One Wireless World. Mr. Schlesselman denies having seen the term letter.

Chau Nguyen's testimony makes it impossible for the court to consider the term letter, even if Mr. Schlesselman actually received it, as a referral of

locations. The court apologizes for the length of the following quotations from the trial transcript, but the fullness is needed to understand what the term letter was, and what it was not:

> Q. Okay. And this document, dealers who will be receiving term letter, this identifies stores working with OWW who were no longer going to be working with OWW, correct?

> A. Not necessarily.

> Q. Weren't these dealers receiving term letters because they refused to go exclusively Sprint?

> A. This was something -- from what I recall, this was a document we kind of created. We analyzed the cell tower strengths in all the markets, and these were ones where we thought that weren't going to make it, and then I think that's why we said "will be," if it made sense.

> Q. So clarify for me, if you will. Is this a list of dealers who refused to go exclusively Sprint?

> A. Refused, not necessarily yet, at that point in time --

> Q. Okay.

> A. -- because it didn't get sent out. When it gets sent out, then that -- when we got all the data on who was going to go Verizon, who's going to go Sprint and stuff, then we were going to send it out, so this isn't necessarily, you know, from that perspective.

> Q. Okay. Does this accurately reflect --

> A. Because I think Wireless Central ended up going exclusive Sprint, from that perspective, right down there, the last two.

> Q. Wireless Central, the bottom two?

> A. I mean, that's what I quickly can recall.

> Q. Those two went Sprint, is what you're saying?

> A. Yeah, some of them -- again, we didn't get to that point yet. That was a point of -- I think, if I'm answering your question correctly, the point where you're at right here is still an analysis stage for us versus execution stage.

Q. So can you identify for me which ones -- which of the dealers identified on Plaintiff's Exhibit 14 failed to go exclusively Sprint and were terminated by OWW?

A. It's such a long time ago, I can't do it with great accuracy, but the only one that pops up in my mind that I can be pretty sure about is Wireless Central.

Q. Okay. So is it -- are you testifying then that, in addition to Wireless Central, that some of the other stores identified on Plaintiff's Exhibit 14 could have gone exclusively Sprint?

A. Could they, yes.

Q. Okay. And you can't tell me as you're sitting here today which ones did and which ones didn't?

A. Without certain records, the only one I can recall right now off the top of my head is, yes, Wireless Central.

Q. Okay. And you'll agree with me, won't you, that if a store went exclusively Sprint, that means that's all it was selling, correct, of the carriers?

A. Yes, at a certain date.

Q. Sure. Yeah. I mean, I'm sure there was a deadline at some point, right?

A. Yeah, because this could have been -- I'm just trying to give you a little perspective. This could have been early 2006, and then we didn't have to transition the whole team over until 2007.

Doc. #172, at 104-106.

Q. Okay. So it's as of October of 2006 that Sprint required your subdealers to go exclusively Sprint or not sell Sprint at all; is that correct?

A. Yeah. I'm just trying to see why this is so much after.

We usually wouldn't do things late like this. But, yeah, it looks like October 1st, but it looks like he sent it October 6th.

Q. That's October 1st of 2006, right?

A. That's -- yeah, that sounds right.

Q. Okay. And so is it fair to say that, if a store went exclusively Sprint, that that's the only carrier it would be selling?

A. With an exclusive master agent -- with an exclusive Sprint partner.

Q. Okay. So is that what you're telling your subdealers or that e-mail is saying to subdealers, that, as of October, you're either exclusive Sprint or you're not Sprint?

A. No, no, no. That's why I said exclusive dealer. We did not want to be -- there's -- carriers, like I told you, they always give you one year, two years, and stuff like that. That's the same thing from a dealer's perspective. They had the opportunity -- and that's why I told you Cingular, too. I mean, when I say this, I'm talking like -- I'm sorry -- the majority of the players in each market, the majority of the players went exclusive Cingular. And then, in this situation, there's exclusive partners and there's non-exclusive partners. And I think, in this situation, it's a relationship we created.

Like I told you before, Wireless Channels is related to American Connections. Wireless Channels bought out American Connections. American Connections was the largest master agent in the country, from that perspective. They chose – their agreement, because of the way they did business, they did business with thousands of multi-carriers, from that perspective, so they chose not to go exclusive. So we chose to go exclusive with Sprint, and the majority of the markets went exclusive. It was more of -- and Wireless Channels, American Connections who had a relationship, too, from that perspective, we worked out an arrangement to help them out.

Q. Okay. So is it your testimony, when OWW went exclusive, that's the only carrier you were selling at that point, right?

A. For us, correct.

Q. "For us." For OWW?

A. Yes, yes, yes.

Q. And is it also accurate that, if a company like OWW refused to go exclusive Sprint, they would not be permitted to sell Sprint; you're either exclusive or you're not?

A. Just for OWW?

Q. Yeah, a company like OWW.

A. No.

* * *

Q. What I'm just trying to find out is, when Sprint said, "OWW, you have to go exclusive in 2006," did that mean you were only selling Sprint, and if you -- that you were only selling Sprint? Let me leave it there.

A. I'm sorry. I don't mean to -- there's no gun to your head; there's options. But the option I chose, correct, is to go exclusive.

* * *

Q. So the option is you can either go exclusive and sell Sprint, or you can say, "No, Sprint, I don't want to be exclusive; I want to sell other carriers;" is that correct?

A. Sprint and their affiliates. There's affiliates that had different names and different brands and stuff.

* * *

Q. That's important. Let's just talk about OWW.

So you made the choice, OWW made the choice, to be exclusively Sprint?

A. Correct.

Q. Now, OWW could have chosen to say, "No, Sprint, we don't want to be exclusive"?

A. That's correct.

Q. And in that case, OWW could have sold other carriers, correct?

A. Yes.

There was multiple contracts. That's why I, kind of -- I want to make sure you get all the answer, but, yes, I think for your purposes.

Q. Okay.

A. If it gets deeper, then I will have to go a little bit deeper because there's exclusive wholesale and non-exclusive wholesale and --

* * *

Q. On Plaintiff's Exhibit 14, there's a Wireless Made Simple.

A. Okay, 14.

Q. If a dealer, for example, Wireless Made Simple that's on Exhibit 14, said, "No, I'm not going exclusive Sprint," and they got a term letter from OWW, what does that mean in regard to that dealer's ability to sell Sprint?

A. Can you pick a date for me?

Q. Well, after they receive a term letter.

A. I don't know if they -- okay. So I don't know if they received --

* * *

Q. All I'm trying to find out, Mr. Nguyen, is if a dealer on Plaintiff's Exhibit 14 received a term letter, what did that mean for that dealer's ability to continue to sell Sprint products?

A. They couldn't sell Sprint through us, but they could sell Sprint through someone else.

Q. Okay. That's my question. Thank you very much.

A. Okay. Yes.

Q. Okay. So they couldn't sell through OWW?

A. That's correct.

Q. Okay. Great.

Doc. #172, at 108-115.

As the court understands Chau Nguyen's testimony, then, the term letter wasn't a report to Moorehead of One Wireless World dealers who had chosen not to stay with One Wireless World as exclusively Sprint dealers. It was a preliminary list, never sent to the dealers, of One Wireless World dealers who might – or might not – leave One Wireless World to avoid being exclusively Sprint dealers. Such a list doesn't serve to notify Moorehead of handoffs or losses caused by Sprint exclusivity. Something more specific is needed.

It isn't clear when Chau Nguyen believes he gave the term letter to Mr. Schlesselman, but the testimony suggests that the term letter was prepared not too long after October 1, 2006, when One Wireless World received notice that Sprint had chosen to require exclusivity. The December 21, 2006 Annabali email that identified "One Wireless World—LOCATIONS" didn't include any facility in Shermansdale, Bellefonte, or Johnstown, and neither did the list Mr. Schlesselman sent back to Mr. Annibali 6 days later.

Because the evidence doesn't permit a finding that the Shermansdale, Bellefonte, or Johnstown locations were referred to Moorehead, none of those can be counted as a referred location.

*f. 335 Park City Center Mall, #6340, Lancaster.*

The Annabali email listed two Park City Mall locations, but One Wireless World occupied various places in that mall at various times, and it doesn't appear that this is one of the listed locations. Chinh Nguyen testified that he "walked the mall" with Mr. Forsyth and Jeff Frye and showed them "the locations we had in the mall and just other opportunities." Dars Communications appears to have operated a store in space #6340, as well; One Wireless World claims referral fees due for two vendors in that space. Moorehead records indicate that the Dars store didn't begin operating until late 2008.

The evidence doesn't show that One Wireless World referred this Park City Mall location, or that it was an operating One Wireless World store at the time of any referral.

### g. 305 Hummel Avenue, Lemoyne ("Global Solutions").

Jordan Golub, whom Chinh Nguyen referred to Moorehead, operated this store. Moorehead briefly made referral payments to One Wireless World for this store. Chinh Nguyen testified that One Wireless World previously had a store at this location, but it's unclear when that store was open. Chinh Nguyen helped Mr. Golub negotiate the lease for this store.

Chinh Nguyen testified that he helped Mr. Golub find a good location, then referred both the location and Mr. Golub to Moorehead. Mr. Golub remembers things differently. He says he looked for, and found, the location he eventually used while accompanied only by his girlfriend. Moorehead points out that when Chinh Nguyen referred Mr. Golub to Moorehead, Chinh Nguyen already had left One Wireless World.

That Chinh Nguyen was no longer a co-owner of One Wireless World means nothing; as explained earlier, Chinh Nguyen worked under a consulting agreement with One Wireless World after the brothers split. He referred the location – even if Mr. Golub found it without Chinh Nguyen's help – to Moorehead. Mr. Golub didn't have a One Wireless World store at the time of the referral.

### h. 720 Quentin Road, Suite 4, Lebanon ("Cellular Nation").

Chris Kelleher operated a Verizon store at this location. Chau Nguyen testified that One Wireless World had had many stores in the Lebanon area, and that Mr. Kelleher had expressed an interest in getting into the business.

Chau Nguyen testified that they discussed non-exclusive stores with Mr. Kelleher, but that Mr. Kelleher decided he wanted to go with Verizon, so they referred him to Verizon (through Moorehead) and Chinh Nguyen helped Mr. Kelleher find a location for a store in Lebanon.

One Wireless World referred Mr. Kelleher – and more importantly, the location where he established his shop. Cellular Nation wasn't operating as a One Wireless World location at the time of the referral.

### i. 960 Lancaster Avenue, Columbia ("Genuine Tobacco").

Chau Nguyen's recollection of this referral wasn't good. He believed that Moorehead simply added a Verizon line to the store's products: "it was not the point in time where you had to be forced to go exclusive." Given the vagaries of his memory and the absence of this location from either the referral agreement or the Annibali email, the court can't find that One Wireless World ever referred this location to Moorehead. Nor can the court find that Genuine Tobacco was an operating One Wireless World store at the time of any referral.

### j. 940 W. Main Street, New Holland ("Triangle Communications").

A store at this location had been operated by a One Wireless World subdealer called Triangle Communications. Chau Nguyen testified that he referred this location to Mr. Schlesselman in a face to face meeting; Mr. Schlesselman didn't disagree.

One Wireless World referred this location to Moorehead, and a One Wireless World store was operating at the time.

## 2. What is a "Referred Location"?

Moorehead contends that as the referral agreement uses the term, a "location" must be a One Wireless World branded store; beyond those stores, Verizon's demand of exclusivity would cause One Wireless World no loss to offset. One Wireless World disagrees; as the argument was set forth in One Wireless World's written final argument:

> While MH argued differently at trial, there is no requirement anywhere in the Referral Agreement that a referred location must be an active OWW-location at the time it opens under MH, although that was often the case. OWW had the market knowledge and knew where Verizon locations would succeed. That is part of the knowledge MH sought when it entered into the Referral Agreement. Moreover, it is a significant process from the time a location is provided to MH and the time the store opens under MH which, MH testified, could take 6 months to 1 year. . . . Frankly, it could be even longer. For example: (i) the location needs to be vetted by Verizon; (ii) an operator often needs to be located; (iii) the operator needs to get signed up under MH; (iv) there are background checks, credit checks, and examination of capital; (v) leases need to be negotiated; (vi) buildout of the store must take place; and (vii) there must be training.

Doc. 174 at 4, n.1.

A court considering an ambiguous contract considers the agreement as a whole, rather than focusing on "individual words, phrases, or paragraphs." Gillespie v. Geico Gen. Ins. Co., 830 N.E.2d 913, 917 (Ind. Ct. App. 2006). The referral agreement recites a purpose other than taking advantage of One Wireless World's experience in the field. It says the "proposed referral fee is designed to compensate OWW for location handoffs and offset loss incurred from adding another carrier to their Branded Store's existing lineup." Moorehead was paying for stores that One Wireless World could no longer keep

in light of Verizon's demand for exclusivity. One Wireless World could find a location that would produce gargantuan revenue for Moorehead and Verizon, but unless the location had an operating One Wireless World store, the referral couldn't be a "location handoff" or "offset loss incurred from adding another carrier [Verizon] to their Branded Store's existing lineup."

But the sentence of the agreement on which Moorehead's argument is built doesn't stand alone. The next sentence in the agreement provides, "This will also include any locations, other than the current list of Branded stores that are approved through Verizon and signed up under Moorehead Communications in the future that are referred directly to us by the OWW group." This sentence embodies a promise to pay referral fees for locations that weren't then-extant One Wireless World stores, and refutes Moorehead's understanding of the term, "referred location."

The referral agreement obligated Moorehead to pay referral fees for activations – another term requiring construction – at locations referred by One Wireless World, regardless of whether a One Wireless World store was in operation at the time of the referral. These, then, were the "referred locations":

- 32 N. Market Street, Elizabethtown (called "Etown");
- 5380 Lincoln Highway, Gap ("Wireless Extreme");
- 132 Strawberry Square, Harrisburg ("Smithmeyer Netwrok";
- 3517 Walnut Street, Harrisburg ("Street Kicks");
- 155 (or 555) Furnace Hills Pike, Lititz ("ZHY Wireless");
- 180 Leaders Heights Plaza, York;
- 1910 Fruitville Pike, Lancaster ("Lancaster Wireless");
- 625 (also 623) Lombard Road, Red Lion;
- 582 Shrewsbury Commons, Shrewsbury;
- 305 Hummel Avenue, Lemoyne ("Global Solutions");
- 720 Quentin Road, Suite 4, Lebanon ("Cellular Nation"); and
- 940 W. Main Street, New Holland ("Triangle Communications").

*C. Activations; Abandonment*

The agreement doesn't define "activation." At the summary judgment stage, the court held that the agreement only addresses Verizon activations, and the agreement's language isn't to be strictly construed against Moorehead, whose agent drafted it. One Wireless World contends "activation" is a broad term that includes anything for which Verizon would pay Moorehead: two-year activations, two-year upgrades, one-year activations, prepaid activations, data activations, and reactivations. Moorehead contends that "additions" are not "activations," and says that in the industry (or more accurately, the industry practice of rewarding dealers) "activations" are limited to two-year activations and two-year reactivations.

Neither side presented evidence other than its own opinion as to what the term means. Moorehead explained that under Verizon's compensation system for dealers, it could be paying One Wireless World more than Verizon paid for the "activations" of a customer who purchased several options at one time; Moorehead also explained that a customer could cancel several of what it calls "additions" after a month (unlike two-year activations and reactivations), which would make the "addition" worth far less to Verizon. It seems logical that one in Moorehead's position wouldn't have promised to pay One Wireless World more than it was getting from Verizon, or at least would have provided for chargebacks in the event a customer cancelled a feature during her contract with Verizon. On the other hand, Moorehead was trying to break into the central Pennsylvania cellular service market, and might have been willing to overpay One Wireless World to some extent to accomplish that goal.

Since neither the industry nor the negotiators persuasively provide meaning for the agreement's term, "activations," the court turns to the course of dealing. It's true that "activations" can be read to include a wide range of cellular products available in the years 2006 and 2007, such as two-year or one-year pay-as-you-go contracts, prepaid contracts, and data additions. But Moorehead never paid One Wireless World a referral fee for anything other than two-year post-paid activations and upgrades, and One Wireless World didn't complain about that until much later. Moorehead sent monthly summaries of the transactions at referred locations. Those summaries identified which transactions were counted for purposes of compensation under the referral agreement. One Wireless World's years of silence in the face of those summaries and payments strongly and persuasively demonstrates that One Wireless World didn't develop a belief of entitlement to compensation for other activations until Moorehead stopped making payments under the referral agreement.

The parties' course of dealing persuades the court that "activations" meant two-year activations and reactivations of Verizon contracts.

This conclusion resolves Moorehead's argument for abandonment, at least as the court understands the argument. Moorehead seems to present alternate theories under the heading of "abandonment." At times, it seems to argue that it can't be liable because One Wireless World abandoned the contract. Abandonment of a contract is a fact issue that turns on intentions. Estate of Kappel v. Kappel, 979 N.E.2d 642, 652 (Ind. Ct. App. 2012). A contract is abandoned when one party acquiesces in the other's acts that are

inconsistent with the contract's existence. <u>Rogier v. Am. Testing & Eng'g Corp,</u>,
734 N.E.2d 606, 619 (Ind. Ct. App. 2000). One Wireless World didn't abandon
the referral agreement; it continued to refer dealers and locations to Moorehead
well after Moorehead said the contract had expired. Moorehead's alternative
argument seems to be that by failing to object to the summaries, One Wireless
World abandoned any argument that the referral agreement required fees for a
broader range of consumer transactions. The holding that the failure to object
shows that "activations" didn't include anything other than two-year
activations and reactivations of Verizon products; the court needn't address
that version of the "abandonment" argument.


*D. Tiered Payments*

To this point, the court has held that Moorehead was obligated to pay
referral fees for 12 referred locations (Etown, Wireless Extreme, Smithmeyer
Network, Street Kicks, ZHY Wireless, York, Lancaster Wireless. Red Lion,
Shrewsbury, Global Solutions, Cellular Nation, and Triangle Communications)
as long as those stores produced two-year activations and reactivations. It
remains to decide whether Moorehead paid the referral fees the agreement
required it to pay. Answering that question requires resolution of a final
question of contract interpretation.

The referral agreement provides:

<u>Monthly Activations for the referred group</u>

*** 20$ per activation (New Activations Only) to assist with ramp
up period which will remain in effect 6 months from the date this

28

agreement is signed by both parties. After which, the referral bonus will be adjusted to the appropriate tier. (See Below)

> 50-150 per month – 10$ referral bonus per activation
> 151-250 per month – 15$ referral bonus per activation
> 251-350 per month – 20$ referral bonus per activation
> 351-450 per month – 25$ referral bonus per activation
> 451-500 per month – 30$ referral bonus per activation
> 501 per month and higher – 35$ referral bonus per activation

*** There will be a flat fee of 10$ per 2 year upgrade in addition to items listed above.

The parties dispute how the number of activations are to be counted when figuring the monthly bonus. One Wireless World contends that referral fees were to be calculated by aggregating every activation in every referred location during a given month; Moorehead says the tier system applied to each store individually. Moorehead also contends that even if sales from all the referred locations (as Moorehead defines them) are aggregated, those locations never produced more than 150 activations per month.

Neither side presented much extrinsic evidence apart from conclusory say-sos. There is no evidence of the drafters' statements of intent or to usage within the parties' business. The parties' course of dealing supports Moorehead's position in the same way it supported Moorehead's understanding of the meaning of "activations." The monthly summaries were sent with each location broken out, and with steady calculations of the monthly referral fees at $20 for each activation during the 6-month ramp-up period, and at $10 for each activation in the months that followed. One Wireless World didn't object to Moorehead's failure to group the referred locations together to calculate the referral fee.

As far as the trial record shows, Moorehead only once sent One Wireless World a monthly statement showing the total activations from all referred locations, and that statement isn't very probative. One Wireless World points to Defendant's Exhibit J-3, an October 2006 attachment to an email from Mr. Schlesselman to Mr. Annibali. That attachment lists $10 referral fees for each of 60 activations in September 2006, but the attachment doesn't specify which stores sold each activation. One Wireless World might be right that the attachment aggregated activations from each referred location, but the exhibit doesn't say that.

The agreement itself provides stronger evidence of the method of counting activations for purpose of the tiered payments. The title of that section of the referral agreement is, "Monthly Activations for the referred group." There seems to be no way to read the referral agreement in which a "referred group" is the same as a "referred location." The formal term references a plural; the latter references a single location. On its second page, the referral agreement lists referred locations as of January 9, 2006. Joe Smithmeyer is shown as operating two locations – 3d & Walnut and Chambersburg Mall; if a "referral group" were anything other than the universe of referred locations, Mr. Smithmeyer's two locations seems likely to be a referral group.

The referral agreement is rife with ambiguities, and the parties' course of dealing – more specifically, Moorehead's billing method, to which One Wireless World didn't object – makes the issue closer than it otherwise might have been. But the extrinsic evidence is too shaky to lead the court to conclude that, in light of the use of the phrase "referral group" when setting out the fee tiers, the

parties intended the activations to be counted store-by-store rather than as a group.

E. Damages

Under the court's construction of the ambiguous portions of the referral agreement, Moorehead was to pay One Wireless World $20 per activation – meaning two year activations and reactivations – for the referred locations. After that, Moorehead was to pay $10 per activation if the activations from all the referred locations – meaning Etown, Wireless Extreme, Smithmeyer Network, Street Kicks, ZHY Wireless, York, Lancaster Wireless. Red Lion, Shrewsbury, Global Solutions, Cellular Nation, and Triangle Communications – totaled between 50 and 150 in a month, or $20 per if the referred locations' total activations were between 151 and 250 in a month, and so on up to $35 if the referred locations' total activations exceeded 500 in any given month.

The evidence shows the amount of referral fees that were paid. Moorehead paid One Wireless World 28 checks totaling $25,027.50 from 2006 through mid-2008. In November 2009, One Wireless World twice asked Moorehead for commission reports and payment history; Moorehead responded that there were no open referred locations with activities warranting payment. One Wireless World asked again in December 2010 and, in July 2011, sent Moorehead a list of some of what it believed to be referred locations, and sent additional communications in August 2011. One Wireless World filed suit in

April 2012. In May 2012, Moorehead sent a check for $45,770 to cover the Etown store's activation from April 2008 through July 2011, when the store relocated. This payment included interest at the rate of 8 percent. After further demand, Moorehead sent a check for another $6,503.24 to cover referral fees from the Etown store in the first quarter of 2008. That check also included interest at the rate of 8 percent.

But it's most unlikely that Moorehead calculated the referral fees in strict compliance with the referral agreement as the court has construed it: Moorehead paid on 6 locations for 24 months. If any of the other 6 locations produced activations, or if any of the 12 referred locations continued operating in their original locations after Moorehead said the referral agreement expired, One Wireless World is entitled to referral fees for those activations. But the parties have given the court too little evidence to determine whether Moorehead still owes referral fees.

Plaintiff's Exhibit 33 is One Wireless World's damages exhibit. One Wireless World counted the number of "NewAct," data, prepaid, and upgrade entries in the .pdf documents and collected the figures for each document batch and each location. All of those "activations" were totaled and divided by 87 -- the longest timeframe for any of the document batches provided -- to calculate the average activations per month. One Wireless World saw this as a "diluted" average because smaller denominators were available. Plaintiff's Exhibit 33 shows that Moorehead owes One Wireless World referral fees of $949,795 for new activations, $824,950 for data activations, $23,695 for prepaid activations, and $484,110 for upgrades. One Wireless World assessed

a fee of $35 for each activation (the court doesn't understand why One Wireless World used that figure, which was the largest referral fee allowed under the agreement) and $10 for each upgrade, and calculates that it should have been paid $2,282,550. Since Moorehead paid $70,797.50, One Wireless World seeks the balance of $2,211,752.50 in damages, plus interest.

One Wireless World explained that its methodology flowed from a magistrate judge's ruling on a discovery issue. Moorehead had produced some of its records in a .pdf format; One Wireless World wanted the records produced in a spreadsheet format that would allow quicker searches. The magistrate judge denied One Wireless World's request, and it became clear at trial that the ruling still rankles Chau Nguyen. In any event, extracting sales figures from the .pdf documents was a cumbersome task.

Plaintiff's Exhibit 33 provides no help in identifying any difference between what was paid and what was due under the referral agreement as the court construes it. The exhibit uses One Wireless World's overbroad definition of "activations" (which the court rejected in Part II-C of this opinion), counts all 17 of what One Wireless World claimed were "referred locations" (which the court rejected in Part II-B of this opinion), uses averages drawn from blocks of as much as eight months (rather than the monthly method set forth in the referral agreement), and even then suffers from arithmetical errors. The exhibit also assumes a referral fee of $35 per upgrade, which can't be right: under the referral agreement, all activations during the 6-month ramp-up period were to produce $20 regardless of volume, and all 2-year upgrades were to produce fees of $10 regardless of volume.

33

The court has looked to other exhibits in the record to figure out what was due and unpaid. But One Wireless World's numbers differ frighteningly from the Moorehead records introduced into evidence. For example, Moorehead's records show that Store #2366, which appears to have been among the most productive of the referred locations, had 1,235 activations (with the highest monthly total at 112) and 410 upgrades; Plaintiff's Exhibit 33 reflects 3,836 activations and 5,460 upgrades. But the Moorehead records in evidence end with November 2007 (based on the 2-year duration theory the court rejected in Part II-A of this opinion), while Plaintiff's Exhibit 33 reflects 2,207 activations and 5,060 activations from then through May 2013.

One Wireless World's damages figures – based on non-referred locations, non-activations, meaningless averages, and bloated referral fees -- are unrealistically high. Moorehead's figures -- based on fewer than half of the referred locations and an overly stingy view of the agreement's duration -- are too low. Damages must be proven with reasonable – though not mathematical – certainty. *See* R & R Real Estate Co. v. C & N Armstrong Farms, Ltd., 854 N.E.2d 365, 370-371 (Ind. Ct. App. 2006). Even a reasonable estimate can't be achieved on this record.

One Wireless World bears the burden of proving its alleged damages by a preponderance of the evidence. Shepard v. State Auto. Mutual Ins. Co., 463 F.3d 742, 745 (7th Cir. 2006) (applying Indiana law). A ruling on a discovery dispute can't reduce that burden. One Wireless World hasn't proved that it was paid any less than it should have been. This record doesn't support a damages award in any amount.

*F. Accounting*

In addition to an award of damages, One Wireless World seeks an accounting: it wants Excel files for all referred locations from the date of the referral agreement to now. One Wireless World further asks the court, once the accounting is produced, to order Moorehead to tender payment of referral fees consistent with the accounting.

An action for an accounting is an equitable proceeding intended to adjust the litigants' account and render complete justice in a single action. Lily, Inc. v. Silco, LLC, 997 N.E.2d 1055, 1076 (Ind. Ct. App. 2013). "[T]o maintain such a suit on a cause of action cognizable at law, as this one is, the plaintiff must be able to show that the accounts between the parties are of such a complicated nature that only a court of equity can satisfactorily unravel them." Dairy Queen, Inc. v. Wood, 369 U.S. 469, 478 (1962). The existence of an adequate remedy at law can defeat an equitable claim for an accounting. First Commodity Traders, Inc. v. Heinold Commodities, Inc., 766 F.2d 1007, 1011 (7th Cir. 1985). A plaintiff deserves the equitable remedy of accounting only when the accounts are too complicated for the factfinder to figure them out. *See* Medtronic, Inc. v. Intermedics, Inc., 725 F.2d 440, 443 (7th Cir. 1984) ("Accountings were deemed inherently equitable in cases between partners and others in particular relationships, but this is not such a case and in most other cases an accounting was equitable only if it was too complex for a jury to understand.").

One Wireless World explains that Moorehead has sole possession of documents needed to determine how much is due. It says Moorehead didn't produce reports for activations and upgrades since May 2013, and One Wireless World thinks some referred locations continue to produce activations and upgrades. It says reactivation information was missing from the records Moorehead produced, which were mostly provided in .pdf format rather than the Excel format which, One Wireless World says, is the industry standard.

As mentioned earlier, the .pdf-vs.-Excel issue was addressed earlier in this litigation. In a hearing before the magistrate judge, One Wireless World sought documents in Excel format, and Moorehead opposed the request. The magistrate judge ruled that Moorehead could produce those records in .pdf format and One Wireless World could conduct a count off those records to learn how many activations took place, and so on. One Wireless World hired a consultant to convert the .pdf records into a searchable format, but the product of that effort contained inaccuracies. One Wireless World turned to the "count" feature that reports how many times a word appears in a given document. One Wireless World says the "count" method can result in inaccuracies.

Ordering an accounting has an undeniable appeal in this case. The court has held that Moorehead might owe referral fees for more vendors and more months than it thought, while One Wireless World's damages exhibit is unhelpful at least in part because it overstates the concepts of "referred locations" and "activations." Under those circumstances, it might be equitable

to order Moorehead to produce the records (maybe even in Excel format) needed to decide whether Moorehead underpaid, and if so, by how much.

But it's also hard to say that One Wireless World – the party seeking the accounting – didn't have an adequate remedy at law. This court held several hearings, issued 6 separate written rulings on discovery-related motions, issued a 47-page summary judgment order, and conducted a 3-day bench trial on One Wireless World's complaint for damages, with this 40-page opinion setting forth findings of fact and conclusions of law. The trial record doesn't suggest that Moorehead produced anything short of what it was ordered to do in discovery, or even that One Wireless World requested post-May 2013 records.

The accounting claim amounts to a duplication of the discovery process, and One Wireless World hasn't provided a sound reason for a discovery Mulligan. An accounting would be redundant: One Wireless World is asking for what it has already received during discovery, albeit in a different electronic format. One Wireless World sought that format during the discovery period, and hasn't offered an argument that the magistrate judge's ruling on that request was in any sense an abuse of discretion. One Wireless World says it doesn't have post-May 2013 records, but cites nothing in the record to support its thought that some referred location continued to produce referral fees after that date.

Due to the unique circumstances of this case, the court, sitting in equity, *see* Atwood v. Prairie Vill., Inc., 401 N.E.2d 97, 100 (Ind. Ct. App. 1980), declines to order an accounting.

III. Conclusion

For all of these reasons, the court finds for Moorehead Communications, Inc. Entertainment USA, Inc. -- "One Wireless World" -- shall take nothing by its complaint. The clerk shall enter judgment accordingly.

SO ORDERED.

ENTERED: August 9, 2017.


　　/s/ Robert L. Miller, Jr.
Judge, United States District Court